U.S. DISTRICT COURT – N.D. OF N.Y.

**FILED**

**Mar 15 - 2025**

John M. Domurad, Clerk

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOMODOU TAAL, MŨKOMA WA NGŨGĨ, and SRIRAM PARASURAMA, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the U.S. Department of Homeland Security; <br><br> Defendants. | **COMPLAINT** <br><br> Civil Action No. 3:25-cv-335 (EEC/ML) <br> _____ <br><br> **DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.     This action seeks to enjoin Defendants Donald J. Trump, the Department of Homeland Security ("DHS"), and DHS Secretary Kristi Noem from enforcing parts of two executive orders ("Orders") – Executive Order 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," 90 Fed. Reg. 8451 (Jan. 30, 2025), ("EO 1"), and Executive Order 14188, "Additional Measures to Combat Anti-Semitism," 90 Fed. Reg. 8451 (Feb. 3, 2025), ("EO 2") – against Plaintiffs and similarly situated persons.

2.     The unprecedented and sweeping character of these Orders – coupled with the threat of imminent enforcement – has unconstitutionally silenced Plaintiffs and chilled protected expression, prohibiting them from speaking, hearing, or engaging with viewpoints critical of the U.S. government or the government of Israel, under threat of criminal prosecution or deportation.

1

These Orders violate the First and Fifth Amendments of the U.S. Constitution and must be enjoined, at least in part.

3.      EO 1 prohibits non-citizens lawfully living in the U.S. – such as Plaintiff Momodou Taal ("Mr. Taal") – from engaging in constitutionally protected speech that Defendants may subjectively interpret as expressing a "hostile attitude" toward U.S. "citizens, culture, government, institutions, or founding principles" on penalty of deportation.

4.      EO 2 declares that "[it] shall be the policy of the United States" to use "all available and appropriate tools" "to prosecute, remove or otherwise hold to account" citizens and non-citizens who engage in activity that Defendants label as "anti-Semitic." EO 2 further mandates the creation of mechanisms to monitor, surveil, and report the lawful expressive activities of non-citizen students, faculty, and staff on university campuses – explicitly linking such surveillance to immigration enforcement including deportation. While EO 2 claims to address harassment based on Jewish identity, public statements by Defendant Trump and other officials reveal that Defendants conflate criticism of the Israeli government and participation in pro-Palestinian advocacy – such as protests against the Israeli military's operations in Gaza – with antisemitism.

5.      Both Orders violate the constitutional rights of U.S. citizens and non-citizens alike by impermissibly restricting speech based on viewpoint, in violation of the First Amendment. They also raise serious due process concerns under the Fifth Amendment by threatening severe penalties – such as deportation or criminal prosecution – based on vague, subjective, and overbroad standards that grant unfettered discretion to government officials. The chilling effect is  lready being felt by both citizens and noncitizens, including Plaintiffs Mūkoma Wa Ngũgĩ ("Prof. Wa Ngũgĩ") and Sriram Parasurama ("Mr. Parasurama"), who now fear government

retaliation for engaging in constitutionally protected expression critical of U.S. foreign policy and supportive of Palestinian human rights.

6.      Defendants' own statements make clear that the Orders are intended to suppress dissenting viewpoints. A White House Fact Sheet released on January 30, 2025, accompanying EO 2 acknowledges that its language is "unprecedented."[1] The Fact Sheet claims that American universities are overrun by "pro-Hamas aliens and left-wing radicals," and that the Orders are designed to suppress speech occurring at "leftist, anti-American colleges and universities." In May 2024, Defendant Trump stated: "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[2]

7.      The threat of adverse immigration enforcement – including deportation – against Mr. Taal is imminent and real. The Fact Sheet "promises" that *every* non-citizen student visa holder residing in the U.S. will be deported by the end of the calendar year if they merely participate in a demonstration in support of Palestine. It quotes Defendant Trump: "To all the resident aliens who joined in the pro-jihadist protests, we put you on notice: come 2025, we will find you, and we will deport you. I will also quickly cancel the student visas of all Hamas sympathizers on college campuses, which have been infested with radicalism like never before."

---

[1] *See* The White House, Fact sheet: President Donald J. Trump Takes Forceful and Unprecedented Steps to Combat Anti-Semitism (Jan. 30, 2025), https://www.whitehouse.gov/fact-sheets/2025/01/fact-sheet-president-donald-j-trump-takes-forceful-and-unprecedented-steps-to-combat-anti-semitism/.
[2] Josh Dawsey, Karen DeYoung, & Marianne LeVine, *Trump told donors he will crush Pro-Palestinian protests, deport demonstrators*, WASH. POST. (May 27, 2024), https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/.

3

8.    At the end of February 2025, in an apparent reference to both citizen and non-citizen students, Defendant Trump's Senior Counsel to the Department of Justice's Civil Rights Division, Leo Terrell, stated: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail — not for 24 hours, but for years." Terrell added that "a lot is going to happen in the next four to five weeks," and that once protestors face a threat of jail time, "it will stop."[3]

9.    Indeed, enforcement began shortly thereafter. On March 9, 2025, Defendant DHS arrested and detained Mahmoud Khalil, a former Columbia University graduate student and prominent participant in pro-Palestinian campus demonstrations. On March 10, 2025, Defendant Trump stated: "This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."[4]

10.    As a non-citizen lawfully living in the U.S., Mr. Taal is entitled to First Amendment protection. The chilling effect imposed by the Orders violates his right to free speech. EO 2's encouragement of the criminal prosecution for engaging in constitutionally protected expression likewise violates his and the citizen-Plaintiffs' First Amendment rights. The Orders also violate Plaintiffs' First Amendment right to receive information, including the right to hear

---

[3] Jewish News Syndicate, DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years', NEWSMAX (Feb. 26, 2025, 9:18 AM), https://www.newsmax.com/us/hamas-terrorists-antisemitic/2025/02/26/id/1200545/.
[4] Donald Trump (@realDonaldTrump), Truth Social (March 10, 2025, 1:05 PM), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

and engage with each other's speech. Both Orders infringe on all Plaintiffs' right to free association, creating a reasonable fear that public association could be construed as "evidence" of antisemitism or a "hostile attitude" toward the U.S. government.

11.    Each Order is also unconstitutionally vague and overbroad. EO 1 imposes an amorphous and subjective standard for what constitutes a "hostile attitude" toward U.S. "government," "institutions," "culture," or "founding principles," depriving Plaintiffs of fair notice and sweeping up substantial amounts of protected speech. EO 2 does the same with regard to activity Defendants may interpret as "anti-Semitic." Vagueness in the First Amendment context demands the highest degree of judicial scrutiny – especially where, as here, the penalties include deportation, criminal prosecution, and the permanent disruption of Plaintiffs' lives and academic careers.

12.    Even Defendants acknowledge the unprecedented breath and scope of these content-based speech restrictions. The chilling effect has already impacted millions across the country. As of November 2024, there were an estimated 1.1 million non-citizens holding valid student visas in the U.S.,[5] alongside millions of citizen peers, professors, and colleagues whose free speech, association, and due process rights are also impaired by the Orders. Not even during wartime has any branch of government attempted to prohibit such a large segment of the population from criticizing the U.S. government, the president, Congress, the Supreme Court, or a foreign government. As Defendant Trump said, the goal is to force people to "behave."

---

[5] Inst. of Int'l Edu., United States Hosts More Than 1.1 Million International Students at Higher Education Institutions, Reaching All-Time High, INST. OF INT'L EDU. (Nov. 18, 2024), https://www.iie.org/news/us-hosts-more-than-1-1-million-intl-students-at-higher-education-institutions-all-time-high/.

13.     Whatever broad authority the President may hold over non-citizens seeking initial entry into the United States, those "plenary powers" do not justify the sweeping domestic content-based speech restrictions imposed here. Defendants' attempt to bar non-citizens from criticizing the U.S. government, its institutions, American culture, or the government of Israel – and to prohibit citizens form hearing those views – serves no legitimate government interest in preventing terrorism or enforcing immigration laws. The justifications offered are pretextual and dangerous. Criticism of the U.S. government does not constitute terrorism, and criticism of the Israeli government is not anti-Semitism. Even if some governmental interest were implicated, the challenged provisions fail strict scrutiny and are not narrowly tailored to achieve any legitimate end.

14.     This Court should therefore:

A.  Vacate Section 1(b) of EO 1's prohibition on speech critical of the government, its institutions, and American culture as applied to non-citizens lawfully living in the U.S.;

B.  Vacate any provisions establishing vetting or enforcement mechanisms to implement Section 1(b), including Sections 2(a)(i), 2(a)(ii), and 2(a)(iv) of EO 1 and the "monitor and report" requirement in Section 3€ of EO 2, as applied to citizens and non-citizens facing risk of criminal prosecution or deportation;

C.  Enjoin Defendants from enforcing any such provision of either EO against non-citizens; and

D.  Enjoin Defendants from enforcing Section 2 of EO 2's criminal prosecution provision against speech and activity by citizens and lawfully present non-citizens critical of the government of Israel.

## PARTIES

15.    Plaintiff MOMODOU TAAL is a citizen of the United Kingdom and the Republic of The Gambia and currently resides in Tompkins County, New York. He is a 31-year-old Ph.D. student in Africana Studies at Cornell University and holds a bachelor's degree in law from the University of East Anglia in the United Kingdom. In the course of his early academic career, he has participated in numerous scholarly panels and authored significant academic works. He has spoken at events hosted by Harvard University, Sheffield University, the Muslim Council of Britain, and the Tahara Collective in Lagos, Nigeria. His first book, *The Malcolm Effect: Revisited*, was published in February 2025.

16.    Plaintiff MŨKOMA WA NGŨGĨ is a U.S. citizen and Professor of Literatures in English at Cornell University. He is the author of *The Rise of the African Novel: Politics of Language, Identity and Ownership*, as well as the novels *Mrs. Shaw, Black Star Nairobi*, *Nairobi Heat* and *Unbury Our Dead With Song*. He has also published two books of poetry: *Logotherapy* and *Hurling Words at Consciousness*. He is the co-founder of the Mabati-Cornell Kiswahili Prize for African Literature. In 2013, *New African* magazine named him one of the 100 most Influential Africans. He is Mr. Taal's professor.

17.    Plaintiff SRIRAM PARASURAMA is a second-year Ph.D. student in the School of Integrative Plant Sciences. In 2023, he was awarded the prestigious NSF Graduate Research Fellowship to support his research on tree physiology and forest ecology. He has also served as a teaching assistant in Food Sciences and currently maintains a 4.3 cumulative GPA. Despite being early in his research career, he already has two scientific publications – one as first author and one as second author.

7

18.    Defendant DONALD J. TRUMP is the President of the United States and is sued in his official capacity. He is responsible for the formulation, issuance, and implementation of the executive orders and policies that are the subject of this action.

19.    Defendant UNITED STATES DEPARTMENT OF HOMELAND SECURITY is an independent agency within the executive branch of the United States government. 6 U.S.C. § 111.

20.    Defendant KRISTI NOEM is the Secretary of the United States Department of Homeland Security and is sued in her official capacity. As Secretary, she is the highest-ranking official within the Department and is responsible for seeing its policies, operations, and enforcement actions. She is charged by law with the supervision and direction of all activities of the Department pursuant to 6 U.S.C. § 112.

## JURISDICTION & VENUE

21.    Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1346(a)(2) in that the matter in controversy arises under the Constitution and laws of the United States, and the United States and its officers are named as Defendants.

22.    Venue is proper in this District under 28 U.S.C. § 1391€(1) because the United States and its officers are Defendants, and at least one Plaintiff resides in the district.

## FACTUAL ALLEGATIONS

**Mr. Taal, a Longtime Advocate for Palestinian Rights, Is Accepted into Cornell University's Graduate Studies Program in February 2022**

23.    Mr. Taal is a citizen of both the United Kingdom and the Republic of The Gambia. He is a currently a graduate student at Cornell University ("Cornell") and lawfully resides in the United States on a F-1 student visa pursuant to 8 U.S.C. § 1101(a)(15)(F)(i).

24.     Mr. Taal's academic journey and professional journey has been shaped by a deep commitment to understanding the historical, cultural, and geopolitical roots of social injustice and political oppression. He is a vocal advocate for Palestinian human rights and a consistent critic of state and institutional actors – including the governments of Israel and the United States – whom he believes are complicit in conducting a genocide against the people of Palestine. In February 2022, Mr. Taal was accepted into Cornell's graduate program at the Africana Studies and Research Center, which offers an interdisciplinary curriculum focused on the global experience of Black communities.

25.     On July 28, 2022, Cornell certified Mr. Taal's Form I-20, Certificate of Eligibility for Nonimmigrant Student Status, with the United States Citizenship and Immigration Services ("USCIS"), thereby confirming his admission and registration in the Student and Exchange Visitor Information System ("SEVIS"). Cornell's Graduate Admissions Specialist, Katherine Muro, attested that she had reviewed Mr. Taal's application, academic transcript, and records, and that Cornell had determined he met all criteria for admission qualifications met all standards for admission, requiring him to pursue a full course of study as defined by 8 C.F.R. 214(f)(6).

26.     Following the issuance and certification of Form I-20, Mr. Taal became eligible to apply for an F-1 student visa under 8 U.S.C. § 1101(a)(15)(F)(i), which he did on June 14, 2022. Since enrolling at Cornell, Mr. Taal has consistently demonstrated academic excellence, maintaining a cumulative GPA of 3.82.

### Mr. Taal Was Approved for Admission by the Department of State and Inspected by Customs and Border Protection at a Port of Entry

27.     On or about August 5, 2022, the U.S. Department of State ("State Department") approved Mr. Taal's student visa application after determining that he was statutorily eligible and

posed no threat to national security. This decision reflected the State Department's conclusion that Mr. Taal satisfied all requirements for admission under the Immigration and Nationality Act ("INA") and that no grounds of inadmissibility applied to him.

28.    Pursuant to 22 C.F.R. § 40.6, "[a] visa can be refused only upon a ground specifically set out in the law or implementing regulations." The regulation further clarifies that the "reason to believe" standard under INA § 221(g) requires a "determination based upon facts or circumstances which would lead a reasonable person to conclude that the applicant is ineligible to receive a visa." The burden of proof rests with the applicant to establish eligibility under INA § 212 or any other applicable legal provision, and Mr. Taal met that burden.

29.    On August 12, 2022, Mr. Taal entered the United States at John F. Kennedy International Airport, where he was inspected and lawfully admitted by U.S. Customs and Border Protection ("CBP"). His admission further confirmed the federal government's prior determination that he met all legal requirements for entry and posed no national security threat.

**After Inspection and Admission to the U.S., Mr. Taal Engaged in Expressive Activity Online and on Campus**

30.    During his time at Cornell, Mr. Taal has established himself as a scholar and public intellectual. He has authored academic articles, been invited to lecture at institutions, and served as a panelist at conferences. Journalists frequently seek his expertise on history, culture, and geopolitics.

31.    As a graduate student, Mr. Taal taught undergraduate classes at Cornell, including *What is Blackness* in Fall 2024 and *Africa: Its Continent and Its People* in Fall 2023. Since 2020, he has hosted *The Malcolm Effect*, a widely followed podcast featuring interviews with American and international scholars on political and historical issues, spanning from post-World War II

anti-colonial movements to contemporary global events. In February 2025, his first book, *The Malcom Effect: Revisited*, was published.

32.     Beyond academia, Mr. Taal has been an outspoken critic of U.S. foreign policy, particularly regarding military and financial support for Israel. He has expressed his views in classroom discussions, on social media, and through his podcast. His critiques have extended to U.S. political figures – including former President Joseph R. Biden,[6] Defendant Trump,[7] and members of Congress[8] – as well as both major political parties,[9] the British government,[10] Israeli Prime Minister Benjamin Netanyahu,[11] the Israeli military,[12] and corporations profiting from military conflicts.[13] His commentary has also addressed broader issues such as wealth

---

[6] Momodou Taal (@momodoutaal), X (Oct. 11, 2023, 10:11 AM), https://x.com/momodoutaal/status/1712141636321390730 ("No one should be tear-gassed, brutalized or arrested for supporting Palestine. What's happening at American universities is disgusting and terrifying.")

[7] Momodou Taal (@momodoutaal), X (Jan. 7, 2021, 4:28 PM), https://x.com/momodoutaal/status/1347239899209068559 ("The silencing of Palestinian voices in this country is violent").

[8] Momodou Taal (@MomodouTaal), X (Oct. 18, 2023, 9:46 AM), https://x.com/MomodouTaal/status/1815871390899396826 ("The U.S. government's silence on the violence in Gaza speaks volumes about where their priorities lie").

[9] Momodou Taal (@momodoutaal), X (Sept. 22, 2021) https://x.com/momodoutaal/status/1440336610344640520 ("The lack of accountability for U.S. foreign policy perpetuates injustice and harm globally").

[10] Momodou Taal (@momodoutaal), X (Sept. 5, 2022, 9:14 AM) https://x.com/momodoutaal/status/1567182099634872321 ("The hypocrisy of U.S. foreign policy in the face of human rights violations is undeniable").

[11] Momodou Taal (@momodoutaal), X (Mar. 13, 2024, 7:42 PM), https://x.com/momodoutaal/status/1836948532621644172 ("World leaders continue to be silent while innocent lives are being lost in Gaza. This is a moral failure").

[12]*Id.*

[13] Momodou Taal (@MomodouTaal), X (Mar. 12, 2024, 8:29 PM), https://x.com/MomodouTaal/status/1851718089991237753 ("The U.S. administration's silence on the violence in Gaza is shameful and speaks volumes about their priorities").

inequality,[14] corporate influence in politics,[15] and U.S. military interventions[16] in Africa,[17] Latin America, and the Middle East.[18]

33.    Mr. Taal faced university disciplinary measures for his participation in student protests and was temporarily suspended on April 26, 2024, and September 23, 2024. However, Cornell did not impose any sanctions affecting his immigration status. An alternative resolution ("Agreement) finalized on January 29, 2025, contained no allegations of violence and allowed Mr. Taal to continue his studies remotely. Under the Agreement, Mr. Taal could return to campus for medical, religious, and research purposes and would regain full campus access at the end of the Spring 2025 semester.

34.    Since entering the United States on an F-1 visa, Mr. Taal has traveled internationally and been lawfully re-admitted upon inspection by Customs and Border Protection

---

[14] Momodou Taal (@MomodouTaal), X (Jan. 4, 2025),
https://x.com/MomodouTaal/status/1875408898292904280 ("'American society despises equality. Extreme inequality is not only tolerated, it is taken as a symbol of the success that liberty promises. But liberty without equality is equal to barbarism.' - Samir Amin").
[15] Momodou Taal (@MomodouTaal), X (Dec. 27, 2022, 5:42 PM),
https://x.com/MomodouTaal/status/1608488775566626816 ("The double standard in how global powers treat human rights violations is stark and unacceptable").
[16] Momodou Taal (@MomodouTaal), X (Jun. 30, 2023, 10:52 AM), ("Affirmative action killed, student loan forgiveness deaded and discrimination against sexual minorities legalised all in a matter of days. The fascists are winning. No such thing as being neutral now").
[17] Momodou Taal (@MomodouTaal), X (Mar. 31, 2024, 3:09 PM),
https://x.com/momodoutaal/status/1774514352822845661?s=46 ("When I was a student in the United States I was so revolted by the ruthless colonial exploitation and political oppression of the people of Africa that I knew no peace. The matter exercised my mind to such a degree that I decided to put down my thoughts in writing and to dilate on the results of some of my research concerning the subject of colonialism and imperialism' - Nkrumah").
[18] Momodou Taal (@MomodouTaal), X (July 25, 2023, 10:12 AM)
https://x.com/MomodouTaal/status/1674792989347155971 ("The international community's inaction in the face of ongoing humanitarian crises is a failure of global responsibility").

on March 19, 2023; May 7, 2023; August 16, 2023; October 14, 2023; January 20, 2024; August 21, 2024; and December 22, 2024.

**Defendant Trump Campaigns on Pledge to "Deport" Students for Protest Activity and Officials Pledge Prosecution of Citizens While Pro-Israel Groups Target Mr. Taal**

35.     During the 2024 presidential campaign, Defendant Trump repeatedly vowed to deport non-citizen students who participate in protest activity. On or about October 28, 2023, he told the Republican Jewish Coalition, "All of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it. Come 2025, we will find you and we will deport you." On May 14, 2024, he told reporters, "Any student that protests, I throw them out of the country… As soon as they hear that, they're going to behave." He described campus protests as a "radical revolution" and promised, "we're going to set that movement back 25 or 30 years." At a rally in Wildwood, New Jersey, he declared, "If you come from another country and try to bring Jihadism or anti-Americanism or anti-Semitism to our campuses, we will immediately deport you."

36.     As Mr. Taal became a prominent voice within the student movement, he faced escalating scrutiny. On March 21, 2024, Representative Jason Smith of the House Committee on Ways and Means – a prominent supporter of Defendant Trump – sent a letter to Cornell President Martha Pollack citing Mr. Taal's public comments as examples of speech that should be curtailed.[19] This letter indicated the Committee had dedicated resources to monitoring protest activity at Cornell, a focus that appears ongoing.

---

[19] Letter from U.S. Rep. Jason Smith to Martha E. Pollack 4 n.16 (March 21, 2024), https://gop-waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf.

37.     Mr. Taal has also been directly targeted by Zionist groups advocating for his removal from the U.S. In November 2024, Betar US ("Betar") compiled a list of pro-Palestinian foreign students it sought to have deported, naming Mr. Taal as the sole individual identified. [20] Betar's director, Ross Glick, delivered this list to Senator John Fetterman and aides from the offices of Senators Ted Cruz and James Lankford, later telling the *New York Post,* "They all gave me the thumbs up." And added that Betar was in communication with prospective Trump administration appointees at the Department of Justice regarding enforcement actions against individuals on the list.[21]

38.     On February 11, 2025, the *Washington Free Beacon* reported that Mr. Taal was considered the most prominent "foreign student" who played a leading role in pro-Palestinian protests – specifically referring to him as the first and most important target – who could face investigation or deportation under a potential Trump executive order.[22] Since then, high-profile social media accounts have called for Mr. Taal's removal, often tagging the official social media account of Immigration and Customs Enforcement ("ICE").[23] On March 13, 2025, Betar posted

---

[20]Jon Levine, *Zionist org preps list of foreign pro-Hamas students, hoping Trump will deport them*, N.Y. POST (Nov. 23, 2024, 8:22 AM), https://nypost.com/2024/11/23/us-news/zionist-org-preps-list-of-foreign-pro-hamas-students-hoping-trump-will-deport-them/.
[21] *Id.*
[22] Alana Goodman, *Trump Pledged To Deport Pro-Hamas Student Visa Holders. Who Are They?*, WASH. FREE BEACON (Feb. 11, 2025), https://freebeacon.com/campus/trump-pledged-to-deport-pro-hamas-student-visa-holders-who-are-they/.
[23] See, e.g., Jews Fight Back (@JewsFightBack), X (Feb. 20, 2025, 1:08 PM), https://x.com/JewsFightBack/status/1892637461412540818 ("This terror supporter Momodou Taal is NOT an American citizen. Why hasn't he been deported yet? Hit like and repost this to get @ICEgov's attention! He's in blatant violation of his visa. DEPORT. NOW").

on X a "Deport Alert" that specifically named Mr. Taal.[24] Mr. Taal's growing fear that he will be the target of an ICE removal operation is grounded in a pattern of escalating attention, coordination among high-ranking political and influential private actors, and public threats by figures with the power to influence immigration enforcement decisions.

### Defendant Trump Issues Executive Orders

<u>EO 1: "Protecting the United States from Terrorists and National Security and Public Safety Threats</u>

39.    Section 1(a) of EO 1 states that it is the policy of the federal government "to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 30, 2025).

40.    Section 1(b) further states that, in order "[t]o protect Americans . . . the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

41.    Section 2 of EO 1 implements enhanced vetting of the speech and political opinions of non-citizens. As relevant to the Plaintiffs:

    a.    Section 2(a)(i) requires Defendant Noem, the Attorney General, and the Director of National Intelligence to "promptly . . . identify all resources that may be used

---

[24] Betar USA (@Betar_USA), X (March 13, 2025, 10:38 AM), https://x.com/Betar_USA/status/1900194755050434943 ("Deport alert: Momodou Taal Affiliation: Cornell University Role: Graduate student Countries of Origin: Gambia and the United Kingdom...").

to ensure that all aliens . . . who are already in the United States, are vetted and screened to the maximum degree possible." *Id.*

      b.    Section 2(a)(ii) mandates the same officials to "ascertain whether [an] individual seeking [an immigration] benefit is . . . not a security or public safety threat." *Id.*

      c.    Section 2(a)(iv) requires the officials to "vet and screen to the maximum degree possible all aliens who . . . are already inside the United States." *Id.*

42.    Section 3 requires the Secretary of State, in coordination with Defendant Noem, the Attorney General and the Director of National Intelligence, to "[r]ecommend *any actions necessary* to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or *replacement of the culture* on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists." (Emphasis added). *Id.* These recommendations were due no later than February 19, 2025, but as of the date of this filing, they have not been made public.

EO 2: "Additional Measures to Combat Anti-Semitism"

43.    Section 1 of EO 2 includes a preamble attacking "the prior administration" for failing to take steps to "protect American Jews," and declaring that "this failure is unacceptable and ends today." Exec. Order No. 14188, 90 Fed. Reg. 8451 (Feb. 3, 2025).

44.    Section 2 states: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*

45.    Section 3 requires Defendant Noem, in consultation with the Secretaries of State and Education, to issue a report within 60 days to "identify[] all civil and criminal authorities or actions within the jurisdiction of" each agency to "combat anti-Semitism." *Id.*

46.    Section 3€ authorizes the Attorney General to make "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.*

47.    High-ranking officials from the Department of Justice have recently indicated Defendants' intent to prosecute citizens like Plaintiff Prof. Wa Ngũgĩ and Mr. Parasurama and subject them to lengthy prison sentences pursuant to EO 2. This threat is imminent. At the end of February 2025, Senior Counsel to the Assistant U.S. Attorney for Civil Rights Leo Terrell told Israel's Channel 12 News: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail — not for 24 hours, but for years."[25] He added, "a lot is going to happen in the next four to five weeks" and that once protestors face a threat of jail time, "it will stop."[26]

---

[25] Jewish News Syndicate, *DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years'*, NEWSMAX (Feb. 26, 2025, 9:18 AM), https://www.newsmax.com/us/hamas-terrorists-antisemitic/2025/02/26/id/1200545/.
[26] *Id.*

48.     On February 28, 2025, the U.S. Department of Justice's Task Force to Combat Anti-Semitism announced it would begin "meet[ing] with university leadership, impacted students and staff, local law enforcement, and community members as it gathers information" about protest activity and alleged "anti-Semitic" activity on campuses in preparation for possible prosecution.[27]

### Executive Orders Impose Chilling Effect on Plaintiffs

49.     As a result of the executive orders, Mr. Taal has been forced to profoundly alter his prior speech and association patterns. He has refrained from attending protests and public political meetings, has substantially reduced his activity on social media, and no longer discusses politics with associates from Cornell, fearing his words will be misinterpreted or reported to government authorities. He lives in constant fear that he may be arrested by immigration officials or police as a result of his speech.

50.     Following the issuance of the Orders, Mr. Taal also began withdrawing from broader forms of public engagement, including canceling speaking engagements and declining invitations to participate in public events – opportunities that had previously been integral to his advocacy work and professional development. Critically, Mr. Taal has been forced to cancel travel to international academic events. For example, he was invited by Queens University in Toronto, Ontario to speak at a launch event for his book, *The Malcolm Effect: Revisited*. He was

---

[27] Press Release, U.S. Dep't of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced#:~:text=Created%20pursuant%20to%20President%20Trump's,schools%20and%20on%20college%20campuses.

unable to attend for fear of being unlawfully detained and deported upon arrival at a U.S. port of entry. He is also fearful of traveling to London to visit family and friends.

51.    As a result of the chilling effect the executive orders have had on Mr. Taal's speech, the citizen-plaintiffs have been unable to listen to his views in the types of public € where Mr. Taal used to be able to speak his mind freely. These € include academic conferences, public political meetings, off-campus protests, and even less formal political discussions in public places like cafés, sidewalks, restaurants, and other locations. Prof. Wa Ngũgĩ and Mr. Parasurama have been deprived of their rights to listen to Mr. Taal's ideas and suggestions about planning peaceful protests and organizing educational meetings about the rights of the Palestinian people, as well as his political insights into the historical, political, and sociological roots of what they understand to be a genocide against the people of Palestine. The loss of Mr. Taal's voice in these spaces has diminished the richness and diversity of political dialogue within the community and has deprived the citizen-Plaintiffs of an important source of intellectual and organizing leadership. The absence of such discussion has also made it harder for Plaintiffs to build momentum around their advocacy work, since they no longer feel safe meeting and brainstorming in public.

52.    As a result, all Plaintiffs have ceased interacting with one another in public locations, fearing that their associations may draw scrutiny. Mr. Parasurama – a U.S. citizen, student, and prominent participant in local campus protests in support of the Palestinian people – used to regularly meet Mr. Taal at political meetings and demonstrations. Since the promulgation of the Orders, they have not met in person for fear that mere association could be construed as "anti-government" or "anti-Semitic." The resulting isolation has eroded their ability to engage in collective action and has undermined their ability to freely express their views on contemporary political events.

**March 2025: Enforcement Begins**

53.    On March 9, 2025, Defendant DHS arrested a former Columbia University graduate student and lawful permanent resident at his apartment in New York City. Following the arrest, DHS spokesperson Tricia McLaughlin issued a public statement declaring that action was taken "in support of President Trump's executive orders prohibiting anti-Semitism" and affirming that Defendant DHS is "committed to enforcing President Trump's executive orders and to protecting U.S. national security."

54.    The individual arrested, Mahmoud Khalil, was a prominent activist on Columbia's campus and, like Mr. Taal, had previously been listed by Betar as a target for removal.[28]

55.    On March 10, 2025, Defendant Trump posted the following statement on the social media platform Truth Social:

> Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the trump Administration will not tolerate it. many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect

---

[28] Surina Venkat, *Department of Homeland Security Confirms Arrest of Palestinian Activist Mahmoud Khalil, SIPA '24*, COLUMBIA SPECTATOR (March 10, 2025), https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24; Azad Essa, *Who is Mahmoud Khalil, the Palestinian student activist facing deportation from the US?* MIDDLE EAST EYE (Mar. 12, 2025), https://www.middleeasteye.net/profile/mahmoud-khalil-who-is-palestinian-student-columbia-facing-deportation-us.

every one of America's Colleges and Universities to comply.
Thank you![29]

## CLAIMS FOR RELIEF

### Count 1: Violation of the First Amendment Right to Free Speech

56.     Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

57.     Each EO has imposed an unconstitutional chilling effect on Mr. Taal's right to free speech. The First Amendment protects "people" and not citizens alone. U.S. Const. Amend. I. This includes non-citizens living in the U.S. "Freedom of speech and of press is accorded [non-citizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

58.     The Orders have had an immediate chilling effect on Mr. Taal, and Defendant Trump's "promise" to deport each and every visa holder who "joined" a pro-Palestinian protest by the end of 2025 renders Mr. Taal's subjective fear of imminent enforcement eminently reasonable. Mr. Taal has been forced to substantially curtail his speech activity. He has cancelled speaking engagements at which he had planned to speak on his views about Defendant Trump, U.S. policy toward Israel and the Israeli invasion of Gaza, he has ceased speaking at local public events or attending peaceful protests on and off Cornell University's campus, as he had done before the executive orders were published, and he has substantially limited his social media posts.

59.     Prof. Wa Ngũgĩ and Mr. Parasurama are similarly chilled by the executive orders. While not threatened with deportation, EO 2 contemplates the criminal prosecution of speech

---

[29] Donald Trump (@realDonaldTrump), Truth Social (March 10, 2025, 1:05 PM), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782

21

deemed "anti-Semitic" by Defendants. The government may not criminalize speech unless that speech is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969). Lacking from either executive order is any language indicating that the speech restrictions are limited to specific imminent lawless action likely to incite such action.

60.    The executive orders plainly impose content-based restrictions on speech by targeting speech that is critical of the U.S. government, its institutions, American "culture" and the State of Israel. "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991); *see, e.g.*, *Cohen v. California*, 403 U.S. 15, 18 (1971) (treating conviction for wearing a jacket with offensive message as based on speech). These rights are of particular importance on university campuses. *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

61.    Content-based restrictions on speech are strictly scrutinized to ensure they pass constitutional muster. Defendants cannot satisfy this test. There is no compelling or legitimate state interest in preventing individuals from criticizing the government, its institutions, Defendant Trump, American government policy, American culture, or the State of Israel. Even if the orders did possess some nexus to an articulable national security concern, such concerns "do not warrant abdication of the judicial role" and courts "should not defer to the government's reading of the First Amendment, even when such interest are at stake." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). Neither executive order contains language that is narrowly tailored to meet a legitimate state end.

62.    By threatening deportation of non-citizens and criminal prosecution of U.S. citizen who protest Israel and Israeli actions in Palestine, the language of executive orders combined with

statements made by Defendant Trump and high-ranking officials in the Department of Justice have had an immediate chilling effect on the speech and activity Plaintiffs, who despite a past pattern and practice of attending protests and criticizing the U.S. government and government of Israel have refrained from such activity in the weeks following the promulgation of the Orders for fear of being arrested, prosecuted, jailed, or deported.

### Count 2: Violation of the First Amendment Right to Listen

63.    Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

64.    The First Amendment protects the right of citizens like Prof. Wa Ngũgĩ and Mr. Parasurama to hear, receive, debate, and discuss views that are critical of the U.S. government with non-citizens. "The First Amendment involves not only the right to speak and publish but also the right to hear, to learn, to know." *Kleindienst v. Mandel*, 408 U.S. 753, 771 (1972). "We have recognized a First Amendment right to receive information and ideas." *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024). *See, e.g.*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Amer. Acad. Of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).

65.    This includes the right to hear criticisms of the government by non-citizens, even when such criticisms come from outside the U.S. (unlike here). In *Lamont v. Postmaster General*, the U.S. Supreme Court struck down an act of Congress requiring citizens to affirmatively request in writing that the Postal Service deliver mail containing "subversive" publications sent by a foreign sender. The Court held that "[t]his amounts in our judgment to an unconstitutional abridgment of the addressee's First Amendment rights." 381 U.S. 301, 307 (1965). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Id.* At 308 (Brennan, J., concurring). "The First Amendment goes

beyond protection of . . . the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

66.     The orders have substantially disrupted Prof. Wa Ngũgĩ and Mr. Parasurama's rights to hear views critical of the U.S. government and government of Israel. The orders deprive the citizen-plaintiffs of their ability to listen to Mr. Taal's historical, political, and academic views on issues of contemporary relevance and therefore violate their First Amendment rights. Likewise, the chilling effect the threat of criminal prosecution has had on Prof. Wa Ngũgĩ and Mr. Parasurama has deprived Mr. Taal of his right to benefit from and discuss their views.

**Count 3: Violation of the First Amendment Right to Association**

67.     Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

68.     All plaintiffs have a First Amendment right to associate with individuals who possess views that are critical of the U.S. government, its institutions, policies, American "culture," or whose views are critical of the Israeli government. "When it comes to the freedom of association, the protections of the First Amendment are triggered not only by actual restrictions on an individual's ability to join with others to further shared goals. The risk of a chilling effect on association is enough, '[b]ecause First Amendment freedoms need breathing space to survive.'" *Ams. For Prosperity Found. V. Bonta*, 594 U.S. 595, 609 (2021) (Quoting *NAACP v. Button*, 371 U. S. 415, 433 (1963)).

69.     By barring non-citizens from criticizing the U.S. government, its institutions, its policies, American culture, and the government of Israel, the orders have chilled Plaintiffs and their professor-colleagues and fellow students from interacting, meeting, holding discussions or

otherwise publicly associating with one another. This implicates each Plaintiff's associational rights, regardless of alienage. Because of Mr. Taal's prominent role speaking against U.S. and Israeli government policy and because EO 1 announced that Defendant DHS is surveilling all non-citizens in the U.S. to monitor their political views, he possesses a reasonable fear that associating with local activists may constitute an "anti-American" act in itself, thereby subjecting him to possible negative immigration consequences. And because EO2's criminal prosecution provision applies to citizens as well as non-citizens, all Plaintiffs fear that Defendants might interpret their association with one another as proof of activity that falls under the ambit of that order. This has produced an unconstitutional chilling effect on all Plaintiffs' right to freely and publicly associate with one another.

### Count 4: Violation of the First Amendment – Vagueness and Overbreadth

70.     Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

71.     Both executive orders are unconstitutionally vague and overbroad. The sweeping and confusing language of the orders creates substantial uncertainty as to the type of speech that is barred. This uncertainty has chilled a broad range of protected speech on the part of Plaintiffs, which renders each order unconstitutionally vague for overbreadth.

72.     "Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned v. City of Rockford*, 408 U.S. 104, 391 (1972) (quotations and citations omitted). A restriction on speech is unconstitutionally vague if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly

legitimate sweep." *Ams. For Prosperity Found. V. Bonta*, 594 U.S. at 615; *United States v. Hansen*, 599 U. S. 762, 770 (2023) (speech restriction is void for vagueness if it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep").

73.    This test is met here. The language of the orders encompasses all speech critical of the government, its institutions, American culture, and the government of Israel. Its scope is unprecedented in the context of First Amendment restrictions. The vast majority of the orders' applications sweep-up clearly protected speech. In fact, the orders criminalize no type of activity or speech that isn't already barred by either the inadmissibility and deportability statutes (8 U.S.C. §§1182 and 1227, respectively) or the criminal "material support for terrorism" statute (18 U.S.C. §2339B). The ban on expressing a "hostile attitude" toward American "culture" is of particular concern as EO1 does not define the elements of American "culture" that are to be insulated from criticism.

74.    The broad and sweeping character of the Orders will lead reasonable individuals to self-censor speech that is plainly protected for fear of transgressing the vague boundaries enumerated therein. The Orders are overbroad and vague in violation of the First Amendment.

**Count 5: Violation of the Fifth Amendment – Vagueness and Lack of Notice**

75.    Plaintiffs hereby incorporate by reference the allegations contained in each and every preceding paragraph, as if fully set forth herein.

76.    Both executive orders are also unconstitutionally vague under the Fifth Amendment because they cause persons "of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926). The degree of precision required increases with the gravity of the penalty and the

importance of the rights at stake. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (higher standard applicable when speech at stake).

77.    EO 2 subjects all Plaintiffs to the threat of prosecution for pro-Palestinian speech, and both EO 1 and EO 2 subject Mr. Taal to the threat of removal. Deportation/removal is a "particularly severe penalty," *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010). Neither executive order provides individuals of common intelligence with an understanding as to the type of speech and association barred. EO 1 conflates any criticism of the U.S. government, its institutions and American "culture" with "terrorism," and EO 2 conflates criticism of the State of Israel with "anti-Semitism." According to Defendant Trump's January 30, 2025, fact sheet on the executive orders, the orders equate "joining protests" with support for "Hamas," a designated Foreign Terrorist Organization ("FTO"). In the fact sheet, Defendant Trump states that college campuses as a whole are "leftist" and "infested with radicalism like never before."

78.    As a result of the vague language of each executive order, the accompanying fact sheet and public statements by Defendant Trump, a person of average intelligence would understand that any criticism of a government "institution" might include a social media post questioning the actions of the office of the president, a decision to sign an open letter expressing concerns over a particular executive action, or that attending a peaceful demonstration in support of the people of Palestine might be construed as "terrorism" or support for "Hamas." In the academic context, this would apply to academic research, homework assignments or statements in class. Because each executive order fails to provide sufficient notice of the type of speech barred, it denies Plaintiffs' due process right to conform their speech to the orders.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Honorable Court grant the following relief:

(a)    Assume jurisdiction over this matter;

(b)    Temporarily restrain and enjoin Defendants from implementing or enforcing Section 1(b) of EO 1 barring speech by non-citizens lawfully residing in the U.S. critical of American "culture, government, institutions, or founding principles," pending further orders from this Court;

(c)    Temporarily restrain and enjoin Defendants from implementing or enforcing other parts of EO 1 to the extent they facilitate the speech restrictions in Section 1(b), including Section 2(a)(i) of EO 1 (requiring extreme vetting and screening of speech by non-citizens "who are already in the United States" lawfully); and Sections 2(a)(ii) and (iv) of EO 1 (allowing speech to be used to deny immigration benefits under the INA);

(d)    Temporarily restrain and enjoin Defendants from implementing or enforcing Section 3€ of EO 2 preparing reports requiring, coercing, or otherwise pressuring universities to "monitor for and report" student and staff campus speech and activity to federal law enforcement and immigration authorities;

(e)    Temporarily restrain and enjoin Defendants from implementing or enforcing Section 2 of EO 2's criminal prosecution authority to arrest, charge, or otherwise prosecute citizens and non-citizens for protected speech criticizing of the government of Israel;

(f)    Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended;

(g)    Pursuant to 5 U.S.C. §702, vacate the specific provisions in both Executive Orders outlined in (b)-€ *supra*;

(h)    Preliminarily and permanently enjoin DHS from enforcing the specific provisions

of the Executive Orders outlined in (b)-€ *supra*;

(i)     Issue a writ of mandamus compelling Defendants to immediately cease implementing the specific provisions of the Executive Orders outlined in (b)-€ *supra* without further delay;

(j)     Award costs and attorney fees under the Equal Access to Justice Act (EAJA), 5 U. S. C. § 2412, and on any other basis justified under law; and

(k)     Grant other such relief that the Court may deem proper.

Dated: March 15, 2025                          Respectfully submitted,

**s/ Eric Lee**                                          **s/ Chris Godshall-Bennett**
MI Bar No. P80058*                            DC Bar No. 1780920*
Attorney for Plaintiffs                          Attorney for Plaintiffs
24225 W 9 Mile Rd., Suite 140              American-Arab Anti-Discrimination Committee
Southfield, MI 48033                           910 17th St. NW, Suite 1000
Telephone: (248) 602-0936                  Washington, D.C. 20006
Fax: (202) 333-6470                            Telephone: (202) 465-4247
Email: ca.ericlee@gmail.com              Fax: (202) 333-6470
                                                           Email: cgb@adc.org

**s/ Mohammad Saleem**                     **s/ Maria Kari**
NY Bar No. 4842753                           TX Bar No. 24127161*
Attorney for Plaintiffs                          Attorney for Plaintiffs
Davis Ndanusa Ikhlas & Saleem LLP     Project TAHA
26 Court St., Suite 603                         5300 N Braeswood Blvd., Suite 4-191
Brooklyn, NY 11242                            Houston, TX 77096
Telephone: (718) 783-6819                  Telephone: (205) 862-8005
Fax: (855) 852-4742                            Fax: (202) 333-6470
Email: msaleem@dnislaw.com            Email: info@mariakari.org

**s/ Jonathan Wallace**
NY Bar No. 1733757†
Attorney for Plaintiffs                          *pro hac vice* forthcoming
P.O. Box 728                                       †admission pending
Amagansett, NY 11930
Telephone: (917) 359-6234
Fax: (202) 333-6470
Email: jonathan.wallace80@gmail.com