**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

MOMODOU TAAL, MŨKOMA WA NGŨGĨ,
and SRIRAM PARASURAMA,

                 Plaintiffs,

   v.

DONALD J. TRUMP, in his official capacity as
President of the United States; U.S.
DEPARTMENT OF HOMELAND SECURITY;
and KRISTI NOEM, in her official capacity as
Secretary of the U.S. Department of Homeland
Security;

                 Defendants.

Civil Action No.   3:25-cv-335 (EEC/ML)

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... vi

I.  PRELIMINARY STATEMENT .................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 4

  A.  Defendant Trump Issues Executive Orders Targeting Pro-Palestine Activism ................ 4

    1.  EO 1: "Protecting the United States from Terrorists and National Security And Public Safety Threats ................................................................................. 5

    2.  EO 2: "Additional Measures to Combat Anti-Semitism" ............................................... 6

  B.  The Executive Orders and Their Enforcement Chill Plaintiffs' Speech and Association .. 8

III. LEGAL STANDARD ................................................................................... 11

IV. ARGUMENT ............................................................................................... 12

  A.  Plaintiffs Have a Strong Likelihood of Success on the Merits ............................ 12

    1.  The Orders Substantially Interfere with the First Amendment ................................... 12

    2.  The Orders Are Unconstitutionally Vague and Overbroad ....................................... 19

    3.  The Orders Are Unconstitutionally Vague and Violate Plaintiffs' Fifth Amendment Rights ................................................................................. 21

  B.  Plaintiffs Have Suffered Irreparable Harm and Will Continue to Suffer Such Harm Absent an Injunction ................................................................................. 22

  C.  The Remaining Factors Weigh Heavily in Favor of a Temporary Restraining Order ...... 23

  D.  Because The Orders Violate the First and Fifth Amendments, This Court Should Enjoin Their Enforcement Nationwide ................................................................... 24

V.  CONCLUSION ............................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**

*Agudath Isr. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020) .................................................... 23

*Amer. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009) .......................... 16

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595 (2021)........................................... 20

*Boston v. Bellotti*, 435 U.S. 765 (1978) ....................................................................... 17

*Brandenburg v. Ohio*, 395 U.S. 444 (1969).................................................................. 15

*Bridges v. Wixon*, 326 U.S. 135 (1945) .................................................................. 13, 21

*Cohen v. California*, 403 U.S. 15 (1971) ...................................................................... 13

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926)................................................. 21

*Covino v. Patrissi*, 967 F.2d 73 (2d Cir. 1992)............................................................. 23

*Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406 (1977).............................................. 24

*Dombrowski v. Pfister*, 380 U.S. 479 (1965) ............................................................... 21

*Elrod v. Burns*, 427 U.S. 347 (1976) ........................................................................... 23

*F.C.C. v. Pacifica Found.*, 438 U.S. 726 (1978) .......................................................... 16

*Fighting Finest, Inc. v. Bratton*, 95 F.3d 224 (2d Cir. 1996)....................................... 18

*First National Bank v. Bellotti*, 435 U.S. 765 (1978) .................................................. 13

*Fong Haw Tan v. Phelan*, 333 U.S. 6 (1948) ............................................................... 21

*Friend v. Gasparino*, 61 F.4th 77 (2d Cir. 2023)......................................................... 15

*Gentile v. State Bar of Nev.*, 501 U.S. 1030 (1991).................................................... 3, 13

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)..................................................... 4, 19

*Hobbs v. County of Westchester*, 397 F.3d 133 (2d Cir. 2005) ................................... 19

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................... 14

*Keyishian v. Bd. Of Regents*, 385 U.S. 589, 603 (1967) .................................................. 14

*Kleindienst v. Mandel*, 408 U.S. 753 (1972) ..................................................................... 16

*Lamont v. Postmaster General*, 381 U.S. 301 (1965) ........................................... 3, 16, 17

*Latino Law Officers Assoc. v. City of New York*, 196 F.3d 448 (2d Cir. 1999) ............ 12

*Lyng v. Int'l Union*, 485 U.S. 360 (1988) ......................................................................... 18

*Million Youth March v. Safir*, 63 F.Supp.2d 381 (S.D.N.Y. 1999) ............................... 12

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ............................................................ 20

*Murthy v. Missouri*, 144 S. Ct. 1972 (2024) .................................................................... 16

*Murthy v. Missouri*, 603 U.S. 43 (2024) ............................................................................ 3

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ............................... 23

*N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ............................ 12

*Nat'l Inst. for Fam. & Life Advocates v. James*, 2024 U.S. Dist. LEXIS 150635, 24-CV-514
  (W.D.N.Y. Aug. 22, 2024) .............................................................................................. 23

*New York Times v. Sullivan*, 376 U.S. 254 (1964) ...................................................... 2, 15

*New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) ......... 24

*Ng Fung Ho v. White*, 259 U.S. 276 (1922) ..................................................................... 21

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ...................................................................... 23

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ....................................................................... 21

*Plyler v. Doe*, 457 U.S. 202 (1982) ................................................................................. 13

*Red Earth LLC v. United States*, 657 F.3d 138 (2d Cir. 2011) ...................................... 12

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) ................................................................ 19

*Reno v. ACLU*, 521 U.S. 844 (1997) ................................................................................ 19

*Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) ................................................................ 17

*Roman Catholic Diocese v. Cuomo*, 592 U.S. 14 (2020) ................................................ 23

*Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 U.S. Dist. LEXIS 86921 (S.D.N.Y. May 23, 2018) ................................................................................................................. 23

*Shelton v. Tucker*, 364 U.S. 479 (1960) .......................................................... 14

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577 (S.D.N.Y. 2002) ........................................................................................................................ 12

*Stanley v. Georgia*, 394 U.S. 557 (1969) ........................................................ 16

*Sweezy v. New Hampshire*, 354 U.S. 234 (1957) ......................................... 3, 14

*United States v. Hansen*, 599 U.S. 762 (2023) .............................................. 20

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) .............................. 13

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) ........................................ 13

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982) ................. 21

*Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988) ........................... 18

*Virginia v. Black*, 538 U.S. 343 (2003) ........................................................... 13

*Vt. Right to Life Comm. v. Sorrel*, 221 F.3d 376 (2d Cir. 2000) ................................ 18

*Watts v. United States*, 394 U.S. 705 (1969) ................................................... 15

*Weiman v. Updegraff*, 344 U.S. 183 (1952) .................................................... 14

**Statutes**

18 U.S.C. § 2339B .............................................................................................. 20

8 U.S.C § 1227 .................................................................................................... 20

8 U.S.C. § 1182 ................................................................................................... 20

**Regulations**

Exec. Order No. 14161, 90 Fed. Reg. 8451 (2025) ...................................... 1, 5, 6

Exec. Order No. 14188, 90 Fed. Reg. 8847 (2025) ......................................... 1, 7

**Constitutional Provisions**

U.S. Const. Amend. I ............................................................................................... 13

U.S. Const. art. III, § 1 ......................................................................................... 24

## I.     PRELIMINARY STATEMENT

Through executive fiat, Defendant Donald J. Trump has imposed sweeping, content-based restrictions that have chilled protected speech of millions of citizens and non-citizens like Plaintiffs Momodou Taal ("Mr. Taal"), Mūkoma Wa Ngũgĩ ("Prof. Wa Ngũgĩ"), and Sriram Parasurama ("Mr. Parasurama"). Executive Order 14161, "Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats," 90 Fed. Reg. 8451 (Jan. 30, 2025), ("EO 1") bars all non-citizens, including those lawfully present in the U.S. like Mr. Taal, from engaging in speech that Defendants deem expresses a "hostile attitude" toward U.S. "citizens, culture, government, institutions or founding principles" on penalty of deportation. Executive Order 14188, "Additional Measures to Combat Anti-Semitism," 90 Fed. Reg. 8847 (Feb. 3, 2025), ("EO 2") bars citizens and non-citizens alike from engaging in activity that Defendants deem is "anti-Semitic" on penalty of deportation (for non-citizens) or criminal prosecution (for citizens and non-citizens).

Defendants acknowledge that the purpose of EO1 and EO2 ("the Orders") is to chill speech and suppress political opposition to the administration and its policies. An official Fact Sheet ("the Fact Sheet") published by the White House on January 30, 2025, accompanying EO 2 states that American universities are overrun by "pro-Hamas aliens and left-wing radicals" and that the Orders are aimed at attacking "leftist, anti-American colleges and universities." Defendant Trump said himself in May 2024 that "[o]ne thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear that, they're going to behave."[1] Senior Counsel to the Department of Justice's Civil Rights Division Leo Terrell stated

---

[1] Josh Dawsey, Karen DeYoung, & Marianne LeVine, *Trump told donors he will crush Pro-Palestinian protests, deport demonstrators*, WASH. POST. (May 27, 2024),

at the end of February 2025: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail – not for 24 hours, but for years." Terrell said, "[A] lot is going to happen in the next four to five weeks" and once protestors face a threat of jail time, "it will stop."[2]

Enforcement of the Orders has now begun. On March 9, 2025, Defendant DHS arrested and detained Lawful Permanent Resident and former Columbia University graduate student Mahmoud Khalil at his home in New York City. Mr. Khalil was prominent in the pro-Palestinian demonstrations on campus. On March 10, 2025, Defendant Trump issued a statement declaring: "This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again."[3]

The right to protest and criticize the government is the "central meaning" of the First Amendment. *New York Times v. Sullivan*, 376 U.S. 254, 273 (1964). "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991). Perhaps nowhere is this right more essential for the

---

https://www.washingtonpost.com/politics/2024/05/27/trump-israel-gaza-policy-donors/. There are indeed "a lot of foreign students" in the U.S., approximately 1.1 million of them as of November 2024. *See* Inst. of Int'l Edu., *United States Hosts More Than 1.1 Million International Students at Higher Education Institutions, Reaching All-Time High*, INST. OF INT'L EDU. (Nov. 18, 2024), https://www.iie.org/news/us-hosts-more-than-1-1-million-intl-students-at-higher-education-institutions-all-time-high/.

[2] Jewish News Syndicate, *DOJ Antisemitism Task Force: We'll Put Hamas Supporters in Jail 'for Years'*, NEWSMAX (Feb. 26, 2025, 9:18 AM), https://www.newsmax.com/us/hamas-terrorists-antisemitic/2025/02/26/id/1200545/.

[3] Donald J. Trump (@realDonaldTrump), Trush Social (March 10, 2025, 1:05 PM), https://truthsocial.com/@realDonaldTrump/posts/114139222625284782.

maintenance of the democratic order than at colleges and universities, where "[t]eachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957).

The Orders have had the immediate impact of chilling the speech of non-citizens like Mr. Taal, a Cornell University graduate student, prominent pro-Palestinian activist, and valid student visa holder. Since the orders were promulgated, Mr. Taal has refrained from attending protests and public political meetings, cancelled travel to international academic conferences, limited what he posts on social media, and self-censored the views he expresses to professors and fellow-students. This not only violates the speech rights of non-citizens lawfully present in the U.S. like Mr. Taal, it also violates the speech rights of citizens like Cornell Prof. Wa Ngũgĩ and Cornell graduate student Mr. Parasurama who have a right to listen to views critical of the government. *Lamont v. Postmaster General*, 381 U.S. 301, 307 (1965); *Murthy v. Missouri*, 603 U.S. 43, 75 (2024) ("[W]e have recognized a First Amendment right to receive information and ideas"). The orders also violate all plaintiffs' First Amendment rights to associate with one another.

In addition, the orders are unconstitutionally vague, leaving Plaintiffs to guess as to what kind of comments about American "culture" or "institutions" Defendants might subjectively interpret as meriting deportation, or what kind of demonstration might make a citizen subject to a years-long prison sentence should they attend. Not only does this deprive citizens and non-citizens alike of their due process right to fair notice, it also has caused both groups to cease clearly protected speech to avoid prosecution or deportation, depriving the each group of their right to hear such protected speech from the other. *See Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972).

As the government acknowledges, such a broad, content-based attack on the speech and associational rights of citizens and non-citizens lawfully present in the U.S. is "unprecedented." There is no compelling state interest at issue here, let alone one that can meet the "strict scrutiny" standard. The Orders' references to "terrorism," "Hamas," and "anti-Americanism" are pretextual scare tactics aimed at further chilling speech. Even if there were a compelling interest the Orders sought to achieve, the broad and sweeping language referenced above is not narrowly tailored to meet any legitimate end.

Only in a dictatorship can the leader jail and banish political opponents for criticizing his administration. A nationwide injunction is therefore necessary while the Court considers the merits.

## II.    STATEMENT OF FACTS

### A.  Defendant Trump Issues Executive Orders Targeting Pro-Palestine Activism

Throughout the presidential campaign, Defendant Trump threatened to "immediately deport" non-citizen students who participate in protests. Speaking to the Republican Jewish Coalition on or about October 28, 2023, Defendant Trump said, "All of the resident aliens who joined in the pro-jihadist protest this month, nobody's ever seen anything like it. Come 2025, We will find you and we will deport you."[4] On or about May 14, 2024, Defendant Trump reportedly told a gathering of reporters that if elected, he would wield the threat of deportation to stifle pro-Palestinian protests and chill speech, declaring, "One thing I do is, any student that protests, I throw them out of the country. You know, there are a lot of foreign students. As soon as they hear

---

[4] Dave Boyer, *Trump vows to deport Hamas sympathizers, restore sanctions on Iran*, WASH. TIMES (Oct. 28, 2023), http://washingtontimes.com/news/2023/oct/28/trump-vows-deport-hamas-sympathizers-restore-sanct/.

that, they're going to behave."[5] Defendant Trump called the protests a "radical revolution" and said, "it has to be stopped now . . . if you get me elected, and you should really be doing this, if you get me reelected, we're going to set that movement back 25 or 30 years."[6] Speaking that same month, Defendant Trump told a rally in Wildwood, New Jersey, "When I am president we will not allow our colleges to be taken over by violent radicals. If you come from another country and try to bring Jihadism or anti-Americanism or anti-Semitism to our campuses, we will immediately deport you. You'll be out of that school."[7]

Making good on his promised ideological cleanse, after his inauguration, Defendant Trump issued the Orders, designed to halt criticism of his administration, the United States, and the State of Israel.

1. *EO 1: "Protecting the United States from Terrorists and National Security And Public Safety Threats*

Section 1(a) of EO 1 states that the policy of the government is "to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan 30, 2025). Section 1(b) sets forth that in order "[t]o protect Americans . . . the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." *Id.*

---

[5] Dawsey, et al., *supra* note 1.
[6] *Id.*
[7] Laura Loomer (@LauraLoomer), X (May 12, 2024, 11:57 PM),
https://x.com/LauraLoomer/status/1789867595392250006.

Section 2 implements enhanced vetting of the speech and political opinions of non-citizens. As relevant to Plaintiffs, Section 2(a)(i) requires Defendant Noem, the Attorney General, and the Director of National Intelligence to "promptly . . . identify all resources that may be used to ensure that all aliens . . . who are already in the United States, are vetted and screened to the maximum degree possible." *Id.* Section 2(a)(ii) requires the same officials to "ascertain whether [an] individual seeking [an immigration] benefit is . . . not a security or public safety threat." *Id.* Section 2(a)(iv) requires the officials to "vet and screen to the maximum degree possible all aliens who . . . are already inside the United States." *Id.*

Section 3, *inter alia*, requires the Secretary of State, in coordination with Defendant Noem, the Attorney General, and the Director of National Intelligence to "[r]ecommend *any actions necessary* to protect the American people from the actions of foreign nationals who have undermined or seek to undermine the fundamental constitutional rights of the American people, including, but not limited to, our Citizens' rights to freedom of speech and the free exercise of religion protected by the First Amendment, who preach or call for sectarian violence, the overthrow or *replacement of the culture* on which our constitutional Republic stands, or who provide aid, advocacy, or support for foreign terrorists." *Id.* (Emphasis added). The recommendations were due no later than February 19, 2025, but as of the date of this filing have not been made public.

2. *EO 2: "Additional Measures to Combat Anti-Semitism"*

Section 1 includes a preamble attacking "the prior administration" for failing to take steps to "protect American Jews," claiming "this failure is unacceptable and ends today." Exec. Order No. 14188, 90 Fed. Reg. 8847 (Feb. 3, 2025).

Section 2 states: "It shall be the policy of the United States to combat anti-Semitism vigorously, using all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence." *Id.*

Section 3 requires Defendant Noem, in consultation with the Secretaries of State and Education, to issue a report within 60 days to "identify[] all civil and criminal authorities or actions within the jurisdiction of" each agency to "combat anti-Semitism." *Id.* Section 3(e) authorizes the Attorney General to make "recommendations for familiarizing institutions of higher education with the grounds for inadmissibility under 8 U.S.C. § 1182(a)(3) so that such institutions may monitor for and report activities by alien students and staff relevant to those grounds and for ensuring that such reports about aliens lead, as appropriate and consistent with applicable law, to investigations and, if warranted, actions to remove such aliens." *Id.*

High-ranking officials from the Department of Justice have recently indicated Defendants' plan to prosecute citizens like Prof. Wa Ngũgĩ and Mr. Parasurama and subject them to long prison sentences as a result of EO 2. This threat is an imminent one. Defendant Trump's Senior Counsel to the Department of Justice's Civil Rights Division Leo Terrell stated at the end of February 2025: "You see all these disorderly demonstrations, supporting Hamas and trying to intimidate Jews? We are going to put these people in jail — not for 24 hours, but for years." He went on to say, "a lot is going to happen in the next four to five weeks" and that once protestors face a threat of jail time, "it will stop." On February 28, 2025, the U.S. Department of Justice's Task Force to Combat Anti-Semitism announced it would begin "meet[ing] with university leadership, impacted students

and staff, local law enforcement, and community members as it gathers information" about protest activity and alleged "anti-Semitic" activity on campuses to prepare for possible prosecution.[8]

## B.  The Executive Orders and Their Enforcement Chill Plaintiffs' Speech and Association

Mr. Taal is a citizen of the United Kingdom and the Republic of The Gambia. He is a graduate student at Cornell University and resides lawfully in the United States pursuant to a valid F-1 student visa under 8 U.S.C. § 1101(a)(15)(F)(i). Before and throughout his time in the United States, Mr. Taal has been a vocal advocate for the rights of the Palestinian people and a consistent critic of governments and institutions he believes are complicit in human rights violations against Palestinians, particularly the government of Israel.

As a result of his prominent position within the student movement, Mr. Taal began to face increased scrutiny for his speech. On March 21, 2024, Representative Jason Smith of the House Committee on Ways and Means – a prominent supporter of Defendant Trump – wrote to Cornell President Martha Pollack and cited comments made by Mr. Taal as an example of the type of speech that must be suppressed.[9] According to the letter, the House Committee on Ways and Means has dedicated substantial resources to monitoring protest activity at Cornell specifically, and there is no indication that this focus has subsided.

Mr. Taal has also been specifically targeted by Zionist groups that support Defendant Trump and are actively lobbying the federal government to remove Mr. Taal from the country. In

---

[8] Press Release, U.S. Dep't of Justice, Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism (Feb. 28, 2025), https://www.justice.gov/opa/pr/federal-task-force-combat-antisemitism-announces-visits-10-college-campuses-experienced#:~:text=Created%20pursuant%20to%20President%20Trump's,schools%20and%20on%20college%20campuses.
[9] Letter from U.S. Rep. Jason Smith to Martha E. Pollack 4 n.16 (March 21, 2024), https://gop-waysandmeans.house.gov/wp-content/uploads/2024/03/Antisemitism-Ltr-to-Universities.pdf.

November 2024, when the Zionist group Betar US ("Betar") prepared a list of pro-Palestinian foreign students it believed should be removed from the country, Mr. Taal was the only person listed by name.[10] The director of Betar, Ross Glick ("Mr. Glick") delivered the list with Mr. Taal's name on it to Senator John Fetterman, as well as to aides from the offices of Senators Ted Cruz and James Lankford. Mr. Glick told the *New York Post*, "They all gave me the thumbs up." *Id*. Mr. Glick also informed the *Post* that "Betar is already in contact with 'prospective' Trump administration appointees in the Justice Department about how best to take action on those identified." The conservative publication *Washington Free Beacon* reported on February 11, 2025 that among all the "foreign students" who "have played a leading role" in pro-Palestinian protests and could face "federal investigation or deportation following an executive order from President Donald Trump," Mr. Taal is the first and most important target.[11] Numerous high-profile social media accounts have issued appeals for Mr. Taal to be removed from the country, including by "tagging" official accounts associated with Immigration and Customs Enforcement ("ICE").[12] On March 13, Betar tweeted a statement titled "deport alert" naming Mr. Taal.[13] Mr. Taal's subjective fear of being the target of a removal operation is rooted in objective reality.

As a result of the executive orders, Mr. Taal has been forced to profoundly alter his prior speech and association patterns. He has refrained from attending protests and public political

---

[10] Jon Levine, *Zionist org preps list of foreign pro-Hamas students, hoping Trump will deport them*, N.Y. Post (Nov. 23, 2024, 8:22 AM), https://nypost.com/2024/11/23/us-news/zionist-org-preps-list-of-foreign-pro-hamas-students-hoping-trump-will-deport-them/.

[11] Alana Goodman, *Trump Pledged To Deport Pro-Hamas Student Visa Holders. Who Are They?*, Wash. Free Beacon (Feb. 11, 2025), https://freebeacon.com/campus/trump-pledged-to-deport-pro-hamas-student-visa-holders-who-are-they/.

[12] *See, e.g.*, @JewsFightBack, X (Feb 20, 2025, 1:08 PM), https://x.com/JewsFightBack/status/1892637461412540818.

[13] Betar Worldwide (@Betar_USA), X (March 13, 2025, 10:38 PM), https://x.com/Betar_USA/status/1900194755050434943.

meetings, he has reduced what he posts on social media by a substantial amount, and he no longer discusses politics with many associates from Cornell for fear that his words will be misinterpreted and reported to government authorities. He is fearful at all times that he may be subject to being arrested by immigration officials or police as a result of his speech.

As a result of the chilling effect the Orders have had on Mr. Taal's speech, the citizen-plaintiffs have been unable to listen to his views in the types of public forums where Mr. Taal used to be able to speak his mind freely. These fora include academic conferences, public political meetings, off-campus protests, and even less formal political discussions in public places like cafés, sidewalks, restaurants and other locations. Mr. Wa Ngũgĩ and Mr. Parasurama have been deprived of their rights to listen to Mr. Taal's ideas and suggestions about planning peaceful protests and organizing educational meetings about the rights of the Palestinian people, as well as his political insights into the historical, political, and sociological roots of what they understand to be a genocide against the people of Palestine.

All plaintiffs have also ceased interacting with one another in public locations, for fear of drawing attention to their associations with one another. Mr. Parasurama, a U.S. citizen, student, and prominent participant in local campus protests in support of the people of Palestine, used to see Mr. Taal regularly at public political meetings and protests. Since the Orders were promulgated in January, they have not been able to meet in person for fear that the mere act of associating with one another may increase the risk of their being perceived as "anti-government" or "anti-Semitic." The resulting isolation has eroded their ability to engage in collective action and has undermined their ability to freely express their views on contemporary political events.

Recent enforcement actions based on the Orders have further increased Plaintiffs' subjective and objective fear, further chilling their speech. On March 9, 2025, Defendant DHS

arrested a former Columbia University graduate student and lawful permanent resident at his apartment in New York City, New York. DHS spokesperson Tricia McLaughlin issued a statement saying the arrest was "in support of President Trump's executive orders prohibiting anti-Semitism" and that DHS is "committed to enforcing President Trump's executive orders and to protecting U.S. national security." The target of this arrest, Mahmoud Khalil, was a prominent activist on campus.[14]

On March 10, 2025, Defendant Trump posted a statement on the social media site Truth Social:

> Following my previously signed Executive Orders, ICE proudly apprehended and detained Mahmoud Khalil, a Radical Foreign Pro-Hamas Student on the campus of Columbia University. This is the first arrest of many to come. We know there are more students at Columbia and other Universities across the Country who have engaged in pro-terrorist, anti-Semitic, anti-American activity, and the Trump Administration will not tolerate it. Many are not students, they are paid agitators. We will find, apprehend, and deport these terrorist sympathizers from our country — never to return again. If you support terrorism, including the slaughtering of innocent men, women, and children, your presence is contrary to our national and foreign policy interests, and you are not welcome here. We expect every one of America's Colleges and Universities to comply. Thank you![15]

### III.    LEGAL STANDARD

To prevail on the pending motion, Plaintiffs must show "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the

---

[14] Surina Venkat, *Department of Homeland Security confirms arrest of Palestinian activist Mahmoud Khalil, SIPA '24*, COLUMBIA SPECTATOR (March 10, 2025, 12:43 PM), https://www.columbiaspectator.com/news/2025/03/10/department-of-homeland-security-confirms-arrest-of-palestinian-activist-mahmoud-khalil-sipa-24/.
[15] Donald J. Trump, *supra* note 3.

plaintiff[s'] favor; and (3) that the public's interest weighs in favor of granting the injunction." *Red Earth LLC v. United States*, 657 F.3d 138, 143 (2d Cir. 2011) (setting forth preliminary injunction standard); *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002) ("The standard for granting a temporary restraining order and a preliminary injunction . . . are identical."). Plaintiffs meet all four factors.

## IV.    ARGUMENT

The Second Circuit has recognized that "[v]iolations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction." *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir. 1996), cert denied, 520 U.S. 1251 (1997); *see also Million Youth March v. Safir*, 63 F.Supp.2d 381, 388 (S.D.N.Y. 1999) (granting preliminary injunction against ban on protest). "[W]hether plaintiffs have satisfied the requirements for a preliminary injunction turns on whether they have shown a likelihood of success on the merits of their claim . . . ." *Latino Law Officers Assoc. v. City of New York*, 196 F.3d 448, 462 (2d Cir. 1999) (citing *Beal v. Stern*, 184 F.3d 117, 123–24 (2d Cir.1999)); *see also N.Y. Progress and Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) ("[C]onsideration of the merits is virtually indispensable in the First Amendment context, where the likelihood of success on the merits is the dominant, if not the dispositive, factor.")

### A.  Plaintiffs Have a Strong Likelihood of Success on the Merits

*1. The Orders Substantially Interfere with the First Amendment*

a)  The Orders Substantially Interfere with Plaintiffs' Free Speech Rights

i.    Mr. Taal's Free Speech Rights

Each executive order has imposed an unconstitutional chilling effect Mr. Taal's right to free speech. The First Amendment protects "the people" and not citizens alone. U.S. Const.

Amend. I. This includes domestic speech engaged in by non-citizens like Mr. Taal when they are lawfully present in the U.S.

"Freedom of speech and of press is accorded [non-citizens] residing in this country." *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). "The Bill of Rights belongs to [non-citizens] as well as to all citizens. It protects them as long as they reside within the boundaries of our land. It protects them in the exercise of the great individual rights necessary to a sound political and economic democracy." *Id.* at 166 (Murphy, J., concurring). Whatever restrictions may be imposed on the speech of non-citizens located extra-territorially who seek initial admission to the U.S., individuals like Mr. Taal who live in the U.S. and have established "substantial connections with this country" are protected by the Bill of Rights. *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990); *Plyler v. Doe*, 457 U.S. 202, 210-12 (1982).

The executive orders plainly impose content-based restrictions on speech by targeting speech that is critical of the U.S. government, its institutions, American "culture" and the government of Israel. "Speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile*, 501 U.S. at 1034; *see also Cohen v. California*, 403 U.S. 15, 18 (1971) (treating conviction for wearing a jacket with offensive message as based on pure speech). "[L]awful political speech [is] at the core of what the First Amendment is designed to protect." *Virginia v. Black*, 538 U.S. 343, 365 (2003). Such speech "is at the heart of the First Amendment's protections." *First National Bank v. Bellotti*, 435 U.S. 765, 776 (1978). "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000).

The government can have no compelling or even a legitimate state interest in preventing individuals to whom the First Amendment applies from criticizing the government, its institutions,

Defendant Trump, American government policy, American culture, or the government of Israel. Even if the orders actually did possess some nexus to an articulable national security concern, such concerns "do not warrant abdication of the judicial role" and courts "should not defer to the government's reading of the First Amendment, even when such interest are at stake." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

These rights are of particular importance on university campuses. In *Sweezy v. New Hampshire*, the U.S. Supreme Court deemed unconstitutional a state government's attempt to investigate the content of a professor's classroom teachings to determine whether he was a "subversive person." The Court held:

> The essentiality of freedom in the community of American universities is almost self-evident. No one should underestimate the vital role in a democracy that is played by those who guide and train our youth. To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made. Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes. Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.

354 U.S. at 250; *see also Weiman v. Updegraff*, 344 U.S. 183 (1952); *Keyishian v. Bd. Of Regents*, 385 U.S. 589, 603 (1967) ("Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom"); *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) ("The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.") Mr. Taal has a high likelihood of succeeding in his First Amendment freedom of speech claim.

ii.    Prof. Wa Ngũgĩ and Mr. Parasurama's Free Speech Rights

The government appears to interpret EO 2 to allow criminal prosecution of citizens like Prof. Wa Ngũgĩ and Mr. Parasurama who speak against what they perceive to be a genocide conducted by the government of Israel with U.S. support.

The government may not criminalize speech unless that speech is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg v. Ohio*, 395 U.S. 444, 447-48 (1969). Speech restrictions of this character must be considered "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co.*, 376 U.S. at 270; *see also Watts v. United States*, 394 U.S. 705, 708 (1969) (political hyperbole not a true threat); *Friend v. Gasparino*, 61 F.4th 77, 90 n.6 (2d Cir. 2023).

By threatening criminal prosecution of U.S. citizens who participate in protests against the government of Israel, the language of EO 2 combined with statements made by Defendant Trump and high-ranking officials in the Department of Justice have had an immediate chilling effect on the speech and activity of Prof. Wa Ngũgĩ and Mr. Parasurama, who despite a past pattern and practice of attending protests and criticizing Israel have refrained from such activity in the weeks following the promulgation of EO 2 for fear of being arrested, prosecuted, and jailed for years.

As stated above, the government can have no compelling or legitimate interest in preventing criticism of the United States or other governments. *Infra* Section IV(A)(1)(a)(i). Even if EO 2 did possess a nexus to the government's interest in enforcing anti-discrimination laws, the massive sweep of the order must be constrained by application of the First Amendment. The courts should not take Defendants at their word that enforcement will be narrowly tailored to violations

of law given their statements and recent enforcement actions that plainly indicate their intention to criminalize any and all speech they deem "anti-Semitic." Criticism of the government of Israel and anti-Zionism are not the same as antisemitism. Even if one finds criticism of the United States or of Israel offensive, "the fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection." *F.C.C. v. Pacifica Found.*, 438 U.S. 726, 745 (1978). The citizen-plaintiffs have a high likelihood of showing EO 2 has chilled their speech in violation of their First Amendment rights to freedom of speech.

     b)  <u>The Orders Substantially Interfere with Plaintiffs' Right to Listen</u>

The First Amendment protects the right of citizens like Prof. Wa Ngũgĩ and Mr. Parasurama to hear, receive, debate and discuss views that are critical of the U.S. government with non-citizens, and vice versa. "The First Amendment involves not only the right to speak and publish but also the right to hear, to learn, to know." *Kleindienst v. Mandel*, 408 U.S. 753, 771 (1972). "We have recognized a First Amendment right to receive information and ideas." *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 (2024). *See generally*, *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *Amer. Acad. of Religion v. Napolitano*, 573 F.3d 115 (2d Cir. 2009).

This includes the right to hear criticisms of the government by non-citizens, even when such criticisms come from outside the U.S. (unlike here). In *Lamont v. Postmaster General*, the U.S. Supreme Court struck down an act of Congress requiring U.S. citizens to affirmatively request the Postal Service deliver mail containing "subversive" publications sent by a foreign publisher. The Court held that "[t]his amounts in our judgment to an unconstitutional abridgment of the addressee's First Amendment rights." 381 U.S. 301, 307 (1965). "The dissemination of ideas can accomplish nothing if otherwise willing addressees are not free to receive and consider them." *Id*.

at 308 (Brennan, J., concurring). "[T]he First Amendment goes beyond protection of . . . the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Boston v. Bellotti*, 435 U.S. 765, 783 (1978).

The Orders have substantially disrupted Prof. Wa Ngũgĩ and Mr. Parasurama's right to listen to Mr. Taal's views on issues of contemporary relevance and vice versa. The citizen-plaintiffs have been unable to listen to his views in the types of public forums where Mr. Taal used to be able to speak his mind freely, including at academic conferences, at public political meetings, during off-campus protests, and even during less formal political discussions in public places like cafés, sidewalks, restaurants and other locations. Prof. Wa Ngũgĩ and Mr. Parasurama have been deprived of their rights to listen to Mr. Taal's ideas and suggestions about planning peaceful protests, organizing educational meetings about Palestinian rights, as well as his political insights into the historical, political and sociological roots of what they understand to be a genocide against the people of Palestine. Plaintiffs have a high likelihood of succeeding on their First Amendment "right to listen" claim.

c) The Executive Orders Substantially Interfere with Plaintiffs' Free Association Rights

The executive orders have prohibited Plaintiffs from associating with one another in public for fear of subjecting themselves or one another to deportation or criminal prosecution.

The Supreme Court has recognized "a right to associate for the purpose of engaging in those activities protected by the First Amendment." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984). The freedom of association is "an indispensable means of preserving other individual liberties," *id.*, for the "freedom to speak [or] to worship . . . could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Id.* at 622. Government action violates the First Amendment if it

interferes with a person's freedom of expressive association in a "'direct and substantial' or 'significant'" way. *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996); *Lyng v. Int'l Union*, 485 U.S. 360, 366-67 n.5 (1988). So too for government action that results in "self-censorship" – "a harm that can be realized even without an actual prosecution." *Vt. Right to Life Comm. v. Sorrel*, 221 F.3d 376, 382 (2d Cir. 2000) (quoting *Virginia v. American Booksellers Ass'n*, 484 U.S. 383, 393 (1988)).

By barring non-citizens from criticizing the U.S. government, its institutions, its policies, American culture, and the government of Israel, the Orders have prohibited Mr. Taal, Prof. Wa Ngũgĩ and Mr. Parasurama from interacting, meeting, holding discussions, or otherwise publicly associating with one another. This implicates each Plaintiff's associational rights, regardless of alienage. Because of Mr. Taal's prominent role speaking against U.S. and Israeli government policy and because EO 1 announced that Defendant DHS is surveilling all non-citizens in the U.S. to monitor their political views, he possesses a reasonable fear that associating with local activists may constitute an "anti-American" act in itself, thereby subjecting him to possible negative immigration consequences. And because EO2's criminal prosecution provision applies to citizens as well as non-citizens, all Plaintiffs fear that Defendants might interpret their association with one another as proof of activity that falls under the ambit of that order. This has produced an unconstitutional chilling effect on all Plaintiffs' right to freely and publicly associate with one another. Plaintiffs therefore have a high likelihood of showing the Orders have substantially impacted their First Amendment right to freely associate with one another.

d) <u>The Government Cannot Satisfy Strict Scrutiny</u>

Strict scrutiny permits the government to restrict speech "only if [it] proves that [its restrictions] are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*,

576 U.S. 155, 163 (2015). Narrow tailoring requires that the restriction on speech be "*necessary* to serve the asserted compelling interest . . . precisely tailored to serve that interest, and . . . the least restrictive means readily available for that purpose." *Hobbs v. County of Westchester*, 397 F.3d 133, 149 (2d Cir. 2005) (internal quotation marks, alteration, and citation omitted). This is a "strict test" because "regulations of speech based on its content are presumptively invalid." *Id.* at 149 (internal quotations omitted).

The Orders proscribe criticism of the government on American university campuses. It would be difficult to imagine a circumstance in which a more rigorous inquiry was required. There is no state interest, compelling or otherwise, in barring criticism of the government of this country or a foreign country, as such an "interest" would be inherently inimical to the Constitution. Neither Order contains language indicating an attempt to narrowly tailor speech restrictions to meet any compelling end, and Defendants' actions and statements indicate their lack of interest in doing so.

    *2. The Orders Are Unconstitutionally Vague and Overbroad*

The Orders are also unconstitutionally vague and overbroad. The sweeping and confusing language of the orders creates substantial uncertainty as to the type of speech barred and plainly sweeps up protected speech. This uncertainty in EO 1 has chilled a broad range of protected speech on the part of non-citizens and that in EO 2 has done the same for the protected speech of citizens. This in turn has had a chilling effect on each group's right to listen to protected speech of the other.

"Where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S at 109 (1972) (quotations and citations omitted); *see also Reno v. ACLU*, 521 U.S. 844, 871-72 (1997) ("The vagueness of such a regulation raises special First

Amendment concerns because of its obvious chilling effect on free speech.") A restriction on speech is unconstitutionally vague if "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021); *United States v. Hansen*, 599 U.S. 762, 770 (2023) (regulation is void for vagueness if it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep").

"The first step in the proper facial analysis is to assess the . . . law's scope" and "[t]he next order of business is to decide which of the laws' applications violate the First Amendment, and to measure them against the rest." *Moody v. NetChoice, LLC*, 603 U.S. 707, 725 (2024).

Both steps militate in Plaintiffs' favor here. The language of the Orders encompasses all speech critical of the government, its institutions, American culture, and the government of Israel. Their scope is unprecedented in the context of First Amendment restrictions. The vast majority of the Orders' applications sweep-up speech that is clearly protected. Under EO 1 a non-citizen may not express a "hostile attitude" to Congress, the Supreme Court, Defendant DHS, or Defendant Trump and his administration's policies. Nor does EO 1 define Defendant Trump's conception of American "culture". For instance, the language of this Order would appear to proscribe scholarship or speech that draws attention to more iniquitous moments in American history, like the expulsion of Native Americans, Jim Crow and the lynching of Black Americans, Japanese Internment, or McCarthyism. On its face the language would even appear to bar criticism of the music of Gershwin, the novels of Dreiser, or the paintings of Rockwell. The Orders criminalize no type of activity or speech that is not already barred by either the inadmissibility and deportability statutes (8 U.S.C. §§ 1182 and 1227, respectively) or the criminal "material support for terrorism" statute (18 U.S.C. § 2339B).

20

The broad and sweeping character of the Orders has led non-citizens and citizens to self-censor speech that is plainly protected for fear of transgressing the vague boundaries enumerated therein. As a result, both groups' right to listen to such protected speech has been chilled.

3.  *The Orders Are Unconstitutionally Vague and Violate Plaintiffs' Fifth Amendment Rights*

Each Order is also unconstitutionally vague under the Fifth Amendment to the U.S. Constitution because they cause persons "of common intelligence . . . necessarily [to] guess at its meaning and [to] differ as to its application." *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926).

The degree of precision required increases with the gravity of the penalty and the importance of the rights at stake. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (higher standard applicable when speech at stake). EO 2 subjects Plaintiffs to the threat of prosecution for pro-Palestinian speech, and both Orders subject Mr. Taal to the threat of removal. "The severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images." *Id.* at 872; *see also Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

Deportation is a "particularly severe penalty," *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010); a "drastic measure and at times the equivalent of banishment or exile," *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948), and may deprive a non-citizen "of all that makes life worth living." *Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922). "The impact of deportation upon the life of an [non-citizen] is often as great if not greater than the imposition of a criminal sentence." *Bridges*, 326 U.S. at 164 (Murphy, J., concurring).

Neither Order provides individuals of common intelligence with an understanding as to the type of speech and association barred. EO 1 conflates any criticism of the U.S. government, its

institutions, and American "culture" with "terrorism," and EO 2 conflates criticism of the State of Israel with "anti-Semitism." According to Defendant Trump's January 30, 2025, fact sheet on the Orders, they equate "joining protests" with support for Hamas, a designated Foreign Terrorist Organization ("FTO"). In the fact sheet, Defendant Trump states that college campuses are "leftist" and "infested with radicalism like never before," indicating that the EO 2 is aimed at targeting left-wing and anti-war speech, with claims of "terrorism" serving as a mere pretext.

EO 2 makes Plaintiffs vulnerable to criminal prosecution for engaging in purportedly "anti-Semitic" behavior. Based on the broad and sweeping language of the Order, combined with the January 30 fact sheet and public statements made by Defendant Trump and his spokespersons, EO 2 fails to provide the Plaintiffs with sufficient notice of the type of speech that may result in their criminal prosecution. This renders it impossible for Plaintiffs to conform their speech to the terms of the Order.

As a result of the vague language of the Orders, the accompanying fact sheet and public statements by Defendant Trump, a person of average intelligence would understand that any criticism of a government "institution" might include a social media post questioning the actions of the office of the president, a decision to sign an open letter expressing concerns over a particular executive action, or that attending a peaceful demonstration in support of the people of Palestine might be construed as "terrorism" or support for Hamas. In the academic context, this would apply to academic research, homework assignments, or statements in class. Because the Orders fail to provide sufficient notice of the type of speech barred, it denies Plaintiffs' due process rights to understand how to conform their speech to the law.

**B. Plaintiffs Have Suffered Irreparable Harm and Will Continue to Suffer Such Harm Absent an Injunction**

Plaintiffs have suffered irreparable harm. "There can be no question that the challenged restrictions, if enforced, will cause irreparable harm" and "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Catholic Diocese v. Cuomo*, 592 U.S. 14, 19 (2020) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Plaintiffs "are suffering irreparable harm each day that their Constitutional freedoms are infringed." *Nat'l Inst. for Fam. & Life Advocates v. James*, 2024 U.S. Dist. LEXIS 150635, 24-CV-514 at *10-11 (W.D.N.Y. Aug. 22, 2024); A plaintiff "has sufficiently demonstrated for preliminary injunction purposes that he may suffer irreparable harm arising from a possible deprivation of his constitutional rights." *Agudath Isr. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (quoting *Covino v. Patrissi*, 967 F.2d 73, 77 (2d Cir. 1992)). "Because the deprivation of First Amendment rights is an irreparable harm, in First Amendment cases 'the likelihood of success on the merits is the dominant, if not the dispositive, factor.'" *Agudath Isr.*, 967 F.2d at 637 (quoting *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013)). Plaintiffs have, at the very minimum, established a "possible" deprivation of their constitutional rights, which is either the dominant or dispositive factor in adjudicating a motion for a temporary restraining order.

## C. The Remaining Factors Weigh Heavily in Favor of a Temporary Restraining Order

The balance of the equities and the public interest also weigh in Plaintiffs' favor. The final factors – the balance of equities and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The "public interest is best served by ensuring the constitutional rights of persons within the United States are upheld." *Sajous v. Decker*, No. 18-CV-2447 (AJN), 2018 U.S. Dist. LEXIS 86921, at *13 (S.D.N.Y. May 23, 2018). "No public interest is served by maintaining an unconstitutional policy when constitutional alternatives are available to achieve the same goal." *Agudath Isr.*, 983 F.3d at 637.

**D. Because The Orders Violate the First and Fifth Amendments, This Court Should Enjoin Their Enforcement Nationwide**

Where "a constitutional violation is found, a federal court is required to tailor the scope of the remedy to fit the nature and extent of the constitutional violation." *Dayton Bd. of Educ. v. Brinkman*, 433 U.S. 406, 420 (1977). The Orders apply nationwide, the chilling effect is national in scope, and therefore the remedy must be national.

The Constitution vests this Court with "the judicial Power of the United States." U.S. Const. art. III, § 1. The Second Circuit has acknowledged that "[w]e have no doubt that the law, as it stands today, permits district courts to enter nationwide injunctions, and agree that such injunctions may be an appropriate remedy in certain circumstances – for example, where only a single case challenges the action . . . ." *New York v. United States Dep't of Homeland Sec.*, 969 F.3d 42, 88 (2d Cir. 2020). Because the instant lawsuit is the first case challenging the two speech-related Orders, a national injunction is appropriate.

Because Plaintiffs have shown a violation of their First and Fifth Amendment rights, and for the reasons that follow, the Court should therefore: (1) vacate Section 1(b) of EO 1's prohibition on speech critical of the government, its institutions, and American culture as applied to non-citizens lawfully residing in the U.S.; (2) vacate any and all provisions of either Order establishing vetting or enforcement mechanisms to enforce Section 1(b) of EO 1 against such persons, including Sections 2(a)(i), (2)(a)(ii) and (iv) of EO 1 and the "monitor and report" requirement in Section 3(e) of EO 2 as applied to non-citizens facing the risk of both prosecution and removal; (3) enjoin Defendants from taking any measures to enforce any such provision of either Order as applied to non-citizens; and (4) enjoin Defendants from enforcing Section 2 of EO 2's criminal prosecution provision against speech and activity by citizens and lawfully present non-citizens criticizing the government of Israel.

## V.    CONCLUSION

For these reasons, the Court should grant the motion and enjoin the government from enforcing the two Executive Orders in question here until the Court can further consider the merits.

Dated: March 15, 2025

Respectfully submitted,

**s/ Eric Lee**
MI Bar No. P80058*
Attorney for Plaintiffs
24225 W 9 Mile Rd., Suite 140
Southfield, MI 48033
Telephone: (248) 602-0936
Fax: (202) 333-6470
Email: ca.ericlee@gmail.com

**s/ Mohammad Saleem**
NY Bar No. 4842753
Attorney for Plaintiffs
Davis Ndanusa Ikhlas & Saleem LLP
26 Court St., Suite 603
Brooklyn, NY 11242
Telephone: (718) 783-6819
Fax: (855) 852-4742
Email: msaleem@dnislaw.com

**s/ Jonathan Wallace**
NY Bar No. 1733757[†]
Attorney for Plaintiffs
P.O. Box 728
Amagansett, NY 11930
Telephone: (917) 359-6234
Fax: (202) 333-6470
Email: jonathan.wallace80@gmail.com

**s/ Chris Godshall-Bennett**
DC Bar No. 1780920*
Attorney for Plaintiffs
American-Arab Anti-Discrimination Committee
910 17th St. NW, Suite 1000
Washington, D.C. 20006
Telephone: (202) 465-4247
Fax: (202) 333-6470
Email: cgb@adc.org

**s/ Maria Kari**
TX Bar No. 24127161*
Attorney for Plaintiffs
Project TAHA
5300 N Braeswood Blvd., Suite 4-191
Houston, TX 77096
Telephone: (205) 862-8005
Fax: (202) 333-6470
Email: info@mariakari.org

*pro hac vice* forthcoming
[†]admission pending