YAAKOV M. ROTH
*Acting Assistant Attorney General*

DREW C. ENSIGN
*Deputy Assistant Attorney General*

JOHN A. SARCONE III
*United States Attorney*

KAREN FOLSTER LESPERANCE
*Chief, Civil Division*
*Office of the United States Attorney*
*Northern District of New York*

AUGUST E. FLENTJE
*Acting Director*

EREZ REUVENI
*Acting Deputy Director*

ETHAN KANTER
*Chief, National Security Unit*
*Office of Immigration Litigation*

PAUL STONE
*Deputy Chief, National Security Unit*
*Office of Immigration Litigation*

BENJAMIN MARK MOSS
*Senior Litigation Counsel*
*Office of Immigration Litigation*

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| _____ ) | |
| MOMODOU TAAL., *et al.*,  ) | Civil Action No. 3:25-cv-335 (ECC/ML) |
|  ) | |
| Plaintiffs-Petitioners,  ) | |
|  ) | |
| v.  ) | |
|  ) | |
| DONALD J. TRUMP, in his official  ) | |
| capacity as President of the United States,  ) | |
| *et al.*,  ) | |
|  ) | |
| Defendants-Respondents.  ) | |
| _____ ) | |

## DEFENDANTS-RESPONDENTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    Status of Taal's Student Visa and This Litigation ................................................. 3
    The Executive Orders ........................................................................................... 7

ARGUMENT ...................................................................................................................... 9

    I.     Re-framed As a Habeas Claim Challenging Taal's Hypothetical Future
           Detention, The Court Still Lacks Jurisdiction To Review Plaintiffs' Claims ........ 9

          A.    Taal Cannot Raise A Habeas Claim Because He Is Not Now In
               ICE Custody And Is Not Yet Subject To a Final Removal Order ............. 9

          B.    Distinguished From Challenges To The Lawfulness Of Detention
               Itself, The Court Lacks Jurisdiction Over The Government's Initial
               Decision to Detain Aliens Placed in Removal Proceedings .................... 11

    II.    Plaintiffs' Motion Fails On The Merits ............................................................. 19

          A.    Plaintiffs Cannot Show a Likelihood Of Success On The Merits ............ 20

          B.    Plaintiffs Will Not Be Irreparably Harmed Absent a TRO ...................... 22

          C.    The Government and Public Will Be Injured by a TRO .......................... 23

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

**Page(s)**

*Aguilar v. Immigration and Customs Enforcement,*
  510 F.3d 1 (1st Cir. 2007) ............................................................................... 13

*Alvarez v. ICE,*
  818 F.3d 1194 (11th Cir. 2016) ................................................................. 17, 18

*Antonyuk v. Hochul,*
  635 F. Supp. 3d 111 (N.D.N.Y. 2022) ............................................................ 19

*Arostegui v. Holder,*
  368 F. App'x 169 (2d Cir. 2010) ..................................................................... 18

*Brown v. Kelly,*
  09 F.3d 467 (2d Cir. 2010) .............................................................................. 16

*Carlson v. Landon,*
  342 U.S. 524 (1952) ......................................................................................... 21

*Demore v. Kim,*
  538 U.S. 510 (2003) ................................................................................... 21, 24

*Dep't of Homeland Sec. v. Thuraissigiam,*
  591 U.S. 103 (2020) ............................................................... 12, 15, 16, 17

*Dixon v. von Blanckensee,*
  994 F.3d 95 (2d Cir. 2021) ................................................................................ 3

*DSE, Inc. v. United States,*
  169 F.3d 21 (D.C. Cir. 1999) .......................................................................... 25

*Gandarillas-Zambrana v. Bd. Immigration Appeals,*
  44 F.3d 1251 (4th Cir. 1995) ........................................................................... 18

*Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist., Santa Clara Cnty., California,*
  411 U.S. 345 (1973) ......................................................................................... 10

*Hope v. Warden York Cnty. Prison,*
  972 F.3d 310 (3d Cir. 2020) ...................................................................... 20, 21

*Jeffery v. City of New York,*
  113 F.4th 176 (2d Cir. 2024) ............................................................................. 3

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) ............................................................................... 13

*Kapoor v. DeMarco,*
    --- F.4th ---, 2025 WL 908234 (2d Cir. Mar. 26, 2025) ............................ 9

*Lucacela v. Reno,*
    161 F.3d 1055 (7th Cir. 1998) ................................................................. 24

*Lucas v. Hadden,*
    790 F.2d 365 (3d Cir. 1986) .................................................................... 20

*Medley v. Garland,*
    71 F.4th 35 (2d Cir. 2023) ....................................................................... 14

*Moore v. Consolidated Edison Co. of N.Y., Inc.,*
    409 F.3d 506 (2d Cir. 2005) .................................................................... 19

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................................. 12

*N.Y. Progress and Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013) .................................................................... 19

*Nasrallah v. Barr,*
    590 U.S. 573 (2020) ................................................................................. 13

*New York v. U.S. Dep't of Homeland Sec.,*
    969 F.3d 42 (2d Cir. 2020) ...................................................................... 20

*Nielsen v. Preap,*
    586 U.S. 392 (2019) ................................................................................. 21

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 23

*Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, PAA Chapter,*
    306 F.2d 840 (2d Cir. 1962) .................................................................... 19

*Preiser v. Rodriguez,*
    411 U.S. 475 (1973) ................................................................................. 10

*Ragbir v. Homan,*
    923 F.3d 53 (2d Cir. 2019) ............................................................... 11, 15

*Rajah v. Mukasey*,
    533 F.3d 427 (2d Cir. 2008) .................................................................................... 14

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471 (1999) .............................................................................................. 18

*Robar v. Vill. of Potsdam Bd. of Trustees*,
    490 F. Supp. 3d 546 (N.D.N.Y. 2020) ..................................................................... 3

*Rumsfeld v. Padilla*,
    542 U.S. 426 (2004) ......................................................................................... 9, 22

*Sajous v. Decker*,
    No. 18-cv-2447 (AJN), 2018 WL 2357266 (S.D.N.Y. 2018) ................................... 16

*Salazar v. Dubois*,
    No. 17-cv-2186 (RLE), 2017 WL 4045304 (S.D.N.Y. Sept. 11, 2017) ................... 19

*Sanchez v. Sessions*,
    904 F.3d 643 (9th Cir. 2018) ................................................................................. 14

*Skaftouros v. United States*,
    667 F.3d 144 (2d Cir. 2011) ................................................................................... 11

*Skinner v. Switzer*,
    562 U.S. 521 (2011). ............................................................................................. 12

*St. Joseph's Hospital Health Center v. American Anesthesiology of Syracuse, P.C.*,
    __ F.4th __ , 2025 WL 794367 (2d Cir. 2024) ....................................................... 22

*Velasco Lopez v. Decker*,
    978 F.3d 842 (2d Cir. 2020) ............................................................................ 12, 15

*Vincenty v. Bloomberg*,
    476 F.3d 74 (2d Cir. 2007) .................................................................................... 22

*Williams v. New York City Hous. Auth.*,
    61 F.4th 55 (2d Cir. 2023) ....................................................................................... 3

*Winter v. NRDC*,
    555 U.S. 7 (2008) ........................................................................................... 19, 20

*Wong Wing v. United States*,
    163 U.S. 228 (1896) .............................................................................................. 21

*Wood v. United States*,
  175 F. App'x 419 (2d Cir. 2006) ................................................................ 18

*Yang v. Kosinski*,
  960 F.3d 119 (2d Cir. 2020) ................................................................... 20

*Zheng v. Decker*,
  No. 14-cv-4663 (MHD), 2014 WL 7190993 (S.D.N.Y. Dec. 12, 2014) ................ 19

## <u>STATUTES</u>

### Immigration and Nationality Act of 1952, as amended:

8 U.S.C. § 1201(i) ................................................................................. 5, 16

8 U.S.C. § 1226 ................................................................................... 11, 15

8 U.S.C. § 1226(a) ....................................................................... 11, 15, 21, 22

8 U.S.C. § 1226(a)(1)) .............................................................................. 15

8 U.S.C. § 1226 (a)(2) .............................................................................. 15

8 U.S.C. § 1226(e) ..................................................................... 11, 12, 15, 21

8 U.S.C. § 1227(a)(1)(B) ........................................................................ 6, 16

8 U.S.C. § 1231(g) .................................................................................. 18

8 U.S.C. § 1252 ...................................................................................... 2

8 U.S.C. § 1252(a) ............................................................................... 14, 17

8 U.S.C. § 1252(a)(2)(B)(ii) ...................................................................... 19

8 U.S.C. § 1252(a)(2)(D) ....................................................................... 14, 18

8 U.S.C. § 1252(b)(9) ............................................................................. 13

8 U.S.C. § 1252(g) ........................................................................... 14, 17, 18

8 U.S.C. § 1252(a)(5) ........................................................................... 14, 17

8 U.S.C. § 1252(b)(9) ........................................................................... 14, 17

8 U.S.C. § 1362 ..................................................................................... 23

28 U.S.C. § 2241 .................................................................................................. 9

**Homeland Security Act of 2002:**

Pub. L. No. 107-296, 116 Stat. 2135 ................................................................. 12

## <u>REGULATIONS</u>

8 C.F.R. § 1003.19 ....................................................................................... 12, 15, 22

8 C.F.R. § 1003.19(f) .......................................................................................... 15, 22

8 C.F.R. § 1003.19(h)(2)(ii) ..................................................................................... 21

8 C.F.R. § 1236.1(d)(1) ............................................................................................ 15

8 C.F.R. § 1292.1 ...................................................................................................... 23

8 C.F.R. § 236.1(b) ................................................................................................... 22

8 C.F.R. § 236.1(d) ................................................................................................... 22

## <u>OTHER AUTHORITIES</u>

90 Fed. Reg. 9451 ...................................................................................................... 8

EO1, Sec. 4(a)(i)-(ii) .................................................................................................. 8

EO2, Sec. 3(a)-(b), (d)-(e) ......................................................................................... 9

EO1 sec. 2(a)-(c), 3(a)-(g) ....................................................................................... 20

EO2 sec. 3(a)-(e) ...................................................................................................... 20

Executive Order 14188,
*Additional Measures to Combat Anti-Semitism*, January 29, 2025 ("EO2").
90 Fed. Reg. 8847 ...................................................................................................... 8

Executive Order 14161,
*Protecting the United States From Foreign Terrorists and Other National Security and Public
Safety Threats*, January 20, 2025 ("EO1").
90 Fed. Reg. 9451 ...................................................................................................... 8

Executive Order 13899, signed on December 11, 2019, which stated it is Executive Branch
policy to enforce Title VI of the Civil Rights Act of 1964 against anti-Semitism.
   84 Fed. Reg. 68779 ................................................................................................. 8

H. R. Rep. No. 104-469(I) (1996), 1996 WL 168955 ................................................. 24

Sen. Jud. Committee Rep. No. 104-249 at 7, 1996 WL 180026 ................................ 23

### <u>FEDERAL RULES OF APPELLATE PROCEDURE</u>

Fed. R. Civ. P. 65(c) ................................................................................................. 24

Federal Rule of Civil Procedure 65 ........................................................................... 19

## INTRODUCTION

At 2:00 p.m. ET on Thursday, March 27, 2025, this Court denied two motions filed by Plaintiffs seeking a temporary restraining order ("TRO"). ECF No. 40. About twenty minutes later, at 2:19 p.m. ET, Plaintiffs filed their third motion for a TRO. ECF No. 41. Plaintiffs' third TRO motion suffers all the same fundamental defects as the prior two. Worse, Plaintiffs fail to *acknowledge*—let alone distinguish—this Court's March 27, 2025, opinion denying the first two TRO motions.[1] Plaintiffs say nothing, because they cannot say much more. This Court's prior order forecloses Plaintiffs' latest TRO motion. The Court should reject it, too.

Plaintiffs' latest motion asks the Court to enjoin Taal's *prospective* immigration detention during removal proceedings. It contends that such detention will be unconstitutional because it will be based on two Executive Orders (EOs) that Taal alleges infringe upon his First Amendment rights. Like his first two TROs mounting facial attacks against the EOs, which are largely internal-facing documents with innumerable lawful applications, Taal's most recent motion suffers a host of jurisdictional and constitutional infirmities.

As the Court has acknowledged, immigration authorities are initiating removal proceedings against Taal. ECF 40 at 2. Plaintiffs' Amended Complaint acknowledges the reality that Taal's visa was revoked—the day before he filed this lawsuit—and the Government has the prerogative to initiate removal proceedings against aliens who lack lawful status. ECF No. 38. As in their prior injunction filings, Plaintiffs seek to transform this proceeding into a

---

[1] Even allowing for the possibility that Plaintiffs overlooked the Court's order denying their first two TRO motions before filing the third, Plaintiffs nevertheless did not thereafter seek leave to amend the current TRO motion in light of that order. The result is that Plaintiffs have asked Defendants to respond to and the Court to adjudicate a motion that is largely if not entirely foreclosed by that order. This has caused unnecessary briefing on arguments either previously rejected, or that might have been reformulated, at a minimum, to avoid needlessly increasing the time, efforts, and cost of this litigation for all concerned.

forum to contest Taal's impending removal proceedings. The Court, however, has explained that although Taal seeks to enjoin the commencement of removal proceedings, Congress "has stripped the District Courts of jurisdiction to decide all legal and factual questions related to an alien's eligibility for removal," ECF No. 40 at 3 (cleaned up), and Taal will have an opportunity to "raise his constitutional challenges before the immigration courts" and, if a final order of removal is issued, before "the appropriate court of appeals." *Id.* at 4. That ruling, issued just days ago, was correct, and it resolves this motion. Here, as there, the Court lacks "jurisdiction to enjoin Mr. Taal's removal proceedings." *Id.*

To the extent Taal seeks to turn this case into a habeas corpus proceeding challenging the lawfulness of detention, such a claim is cognizable only when a petitioner is in custody, which Taal is not. If Taal is later detained, he may file a habeas petition in a federal district court embracing the location of the immediate custodian of his confinement.

And the fact that Taal's removal proceedings, and his potential detention attendant to them, arise in part because of the President's EO relating to antisemitism does not change the analysis. Relevant here, the EO states a broad policy directive to the Government to combat "unlawful" antisemitic harassment and violence. That directive is undoubtedly lawful. If Taal takes issue with how an executive agency *implements* that directive, using its existing legal authority (*e.g.*, ECF No. 38 ¶¶ 12, 21, 118), Taal should challenge that discrete action, within the bounds of Article III, and consistent with whatever statutory framework Congress has provided, including the well-established claim-channeling provisions of the INA at 8 U.S.C. § 1252.

For these reasons, as with Plaintiffs' prior two TRO motions, their third should fail too.

# BACKGROUND

## Status of Taal's Student Visa and This Litigation

Plaintiff Momodou Taal, a native of The Gambia and citizen of the United Kingdom, last entered the United States on December 22, 2024, with an F-1 student visa, to study as a graduate student at Cornell University.  Decl. of Anthony Patrone ("Patrone Decl."[2]) ¶ 3.

News sources reported that Cornell University suspended Taal on or around April 26, 2024, for his role in the pro-Palestinian Arts Quad encampment.[3]  *See also* Declaration of Roy M. Stanley ("Stanley Decl.") ¶ 6.  He failed to comply with University directives to remove the unauthorized encampment, cease unreasonably loud chants and behavior, and disperse.[4]  *See also* Stanley Decl. at ¶ 6.  The University suspended Taal a second time later that year in September for his involvement in disrupting a career fair.[5]  *See also* Stanley Decl. at ¶ 6.  Taal was either part of or followed students who forced their way into the hotel holding the career fair, "pushing aside Cornell University police officers," failing to follow University directives and orders from

---

[2] Except where noted, Defendants refer to declarations filed with Defendants' March 22, 2025 opposition to Plaintiffs' first two TRO motions, ECF Nos. 30-1, -2, & -3.

[3] https://www.cornellsun.com/article/2024/04/breaking-cornell-suspends-four-student-protestors (viewed March 22, 2025).  The Court may take judicial notice of facts "generally known within the territorial jurisdiction" or facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Dixon v. von Blanckensee*, 994 F.3d 95, 102 (2d Cir. 2021).  Judicial notice of media reports is appropriate where the news media's reporting of events was not episodic but, rather, pervasive, and largely consistent with one another in their factual accounts of specific events.  *See Jeffery v. City of New York*, 113 F.4th 176, 179–80 (2d Cir. 2024).  For example, in a constitutional challenge to the City of New York's curfew imposed during the George Floyd protests, the court took judicial notice of media reports insofar as they detailed widely documented events or demonstrated the sort of information available to government officials at the time of the challenged action. *See id* (citing *Williams v. New York City Hous. Auth.*, 61 F.4th 55, 61 (2d Cir. 2023)); *see also Robar v. Vill. of Potsdam Bd. of Trustees*, 490 F. Supp. 3d 546, 564 and n. 7, 8 (N.D.N.Y. 2020) (taking judicial notice of local articles and letters to the editor to establish that local community viewed plaintiff's art as an expression of political speech).

[4] *Id.*

[5] https://www.cornellsun.com/article/2024/10/student-assembly-member-among-pro-palestinian-activists-suspended-over-career-fair-disruption (viewed March 22, 2025)

the police, and shutting down the career fair through disruptive conduct[6] "so loud that bystanders reported medical complaints and possible hearing loss." Stanley Decl. at ¶ 8; Declaration of John Armstrong ("Armstrong Decl.") ¶ 4. The University informed Taal that he faced termination of his F-1 status.[7] After an appeal process, the University permitted Taal to continue his studies but banned him from campus until the end of the semester.[8] *See also* ECF No. 33-2. Taal claimed his actions were "peaceful and in accordance with [his] First Amendment rights," but the University found that he had infringed on the rights of other students who wanted to attend the career fair and created a security threat to other students.[9] According to Provost John Siliciano, "it [is] critically important to note that there are thousands of students, staff and faculty who have equally strong and painful views on all sides of this crisis and yet manage their fear, anger and turmoil without interfering with the rights of others."[10]

Taal has now attempted to minimize the extent or seriousness of his conduct in support of his claim that the University, and later the Government, targeted or will target him because of his viewpoint. *E.g.*, Pls.' 1st TRO Reply (March 23, 2025), ECF No. 33 at 1; Pls.' 3d TRO Mot. at 13, ECF No. 41-1 & 41-2 ¶ 8. But in a January 21, 2025 agreement Taal signed with the University, Taal admitted that on or about April 25, 2024, he "violated the . . . Student Code [of Conduct]," by: (1) engaging in "disorderly conduct," specifically, "[u]nreasonably loud or belligerent behavior"; (2) "disrupt[ing] University [a]ctivities" by "[s]ubstantially obstructing the

---

[6] *See also id.*; https://www.cornellsun.com/article/2024/09/breaking-nearly-20-pro-palestinian-protesters-who-shut-down-career-fair-face-discipline-president-says (viewed March 22, 2025)
[7] https://www.cornellsun.com/article/2024/10/suspended-international-graduate-student-can-continue-studies-remotely-remains-barred-from-campus-interim-provost-decides (viewed March 22, 2025)
[8] *Id.*
[9] *Id.*
[10] *Id.*

lawful use of . . . University premises . . . or by making unauthorized entry upon or use of a University property or facility or by unlawfully remaining" there; (3) failing to comply with a lawful directive of a University official; and (4) engaging in "[u]nauthorized [e]ntry or [u]se of [s]pace," specifically, a "[b]uilding a structure on the campus without a permit or in violations of the conditions of a permit." ECF No. 33-2 at 2. Taal further admitted that on September 18, 2024, he "violated the following provisions of the Code": (5) a second charge of disorderly conduct; (6) a second charge of disrupting university activities, this time by "[i]ntentionally obstructing or restraining the lawful participation of another person in an authorized activity or event . . . ."; (7) a second charge of failing to comply with a lawful directive of a University official; and (8) a second charge of unauthorized entry or use of space. ECF No. 33-2 at 3.

The U.S. Department of Homeland Security, U.S. Immigration and Customs Enforcement (ICE) became aware of open-source records indicating that Taal had engaged in certain problematic conduct, as elaborated in the declaration of Roy M. Stanley, including failing to comply with University directives leading to the university banning him from campus. Stanley Decl. ¶¶ 6-10. On or around March 14, 2025, ICE transmitted written communication to the Department of State seeking the State Department's determination as to whether Taal engaged in wrongful conduct that created a hostile environment for Jewish students, and thus had taken actions calling into question his continued eligibility for a U.S. visa. Armstrong Decl. ¶ 4.

Later that day the U.S. Department of State revoked Taal's F-1 student visa under INA § 221(i), 8 U.S.C. § 1201(i). Armstrong Decl. ¶¶ 5 & 9. State's declarant explained that in revoking the visa, State relied upon the underlying information and assessment provided by ICE that Taal had had engaged in an escalating pattern of conduct (including disregarding university policies) that created a hostile environment for Jewish students. Armstrong Decl. ¶ 5. This

pattern of activity called into question Taal's ability to establish his continued entitlement to nonimmigrant F-1 status, implicating State's discretionary authority to determine whether to revoke the visa under INA § 221(i). *Id.*

On March 14, 2025, the State Department notified ICE that it had revoked Taal's F-1 student visa. Patrone Decl. ¶ 4. Because Taal's authorization to be present in the United States has been revoked under Immigration and Nationality Act (INA) § 221(i), he lacks lawful immigration status and is therefore deportable from the United States pursuant to INA Section 237(a)(1)(B). *See* 8 U.S.C. § 1227(a)(1)(B); Patrone Decl. ¶ 4. Upon learning of the visa revocation and Taal's lack of lawful immigration status on March 14, 2025, ICE began to look for Taal to serve him with notice of these developments along with process to place him into removal proceedings. *Id.* ¶ 5.

Plaintiffs filed this lawsuit the following day. ECF No. 1. Taal initially contended that ICE was trying to take him into custody in response to this lawsuit. ECF No. 25 at 2. But the Court found otherwise, noting that "Taal's visa was revoked before the Complaint was filed," ECF No. 40 at 6, rendering his immigration status unlawful before this lawsuit began. *Id.* ICE's efforts to place Taal into removal proceedings are a result of his changed immigration status, not this lawsuit. Patrone Decl. ¶¶ 4-5. Through this lawsuit Taal now seeks to prevent ICE from detaining him attendant to removal proceedings. *Compare* Amend. Compl. Prayer, ECF No. 38-1 at 27-28, *with* 3d TRO Mot., ECF No. 41-3 at 20. However, as the Court's March 27, 2025 order noted, *e.g.*, ECF No. 40 at 3, removal proceedings are the process Congress designed for assessing the issues raised in this case.

Between March 14, 2025, and the present, ICE attempted to serve Taal with a Form I-862, Notice to Appear in removal proceedings, and to take him into custody. *Id.* ¶¶ 4-5. To this

undersigned's knowledge, ICE's efforts have not succeeded. *Id.* Therefore, as Taal noted, on March 21, 2025, undersigned counsel contacted counsel for Taal to share that ICE invites Taal and his counsel to appear in-person at the HSI Office in Syracuse at a mutually agreeable time for personal service of the NTA and for Taal to surrender to ICE custody. ECF No. 25-2. Taal indicated, through counsel, that he "will expediently [sic] cooperate with all rulings of this Court," ECF No. 41-2 ¶ 5, and that "[a]t the Court's instruction, Mr. Taal will, of course, cooperate with your request." ECF No. 25-3. And on March 28, 2025, it was reported that Taal "said he would voluntarily surrender [to ICE] if the [C]ourt ordered it."[11]

To date, however—including now that the Court denied Taal's first two TRO motions, including due to jurisdictional defects, ECF No. 40 at 3—Taal has not, to the undersigned counsel's knowledge, contacted ICE or the undersigned to propose a time when he is willing to be served with a NTA and surrender to ICE custody. Rather, Taal amended his Complaint to style it as a habeas corpus petition (even though he is not detained) and filed a third TRO motion substantially similar to his prior two.

**The Executive Orders**

Taal's key concern in his current framing of this lawsuit appears to be avoiding being detained attendant to removal proceedings, which he alleges would be unconstitutional because such proceedings will be based on the implementation of EOs that he believes violate his free speech rights. *Compare* ECF Nos. 41 at 1, 41-1 at ii, 41-4 at 1-2 (third TRO motion), *with* ECF No. 38-1 at 27-28 (Amended Complaint). For convenience, Defendants briefly summarize those Executive Orders and refer to them according to the convention Plaintiffs suggested and the Court adopted in its March 27, 2025 order. *E.g.*, ECF No. 40 at 1-2.

---

[11] https://www.nytimes.com/2025/03/28/us/cornell-student-deportation-protest.html (viewed March 29, 2025)

EO1:  The President signed Executive Order 14161, *Protecting the United States from Foreign Terrorists and Other National Security and Public Safety Threats*, on January 20, 2025 ("EO1").  90 Fed. Reg. 9451.  The EO declares it "the policy of the United States to protect its citizens from aliens who intend to commit terrorist attacks, threaten our national security, espouse hateful ideology, or otherwise exploit the immigration laws for malevolent purposes." EO1, Sec. 1(a).  It further declares the need to ensure that aliens "present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid or support designated foreign terrorists and other threats to our national security."  EO1, Sec. 1(b).  To this end, EO1 calls for executive departments and agencies to "identify resources" (Sec. 2(a)(i)), "determine information needed" (Sec. 2(a)(ii)), "submit . . . report[s]" (Sec. 2(b)(i)), "evaluate" existing policies, programs, and guidance (Sec. 3(a), (c), (f))), and "recommend" actions (Sec. 3(g)).  To the extent that EO1 requires departments or agencies to take direct action in furtherance of its stated policy goals (*see, e.g.,* Sec. 2(b)(iii), 2(b)(iv), 3(a), 3(b), 3(e)), Section 4 makes plain that nothing in the EO shall impair or affect the legal authorities of executive departments or agency heads, and requires that the EO be implemented consistent with applicable law.  EO1, Sec. 4(a)(i)-(ii).

EO2:  The President signed Executive Order 14188, *Additional Measures to Combat Anti-Semitism*, on January 29, 2025 ("EO2").  90 Fed. Reg. 8847.  EO2 reaffirms the President's prior Executive Order 13899, signed on December 11, 2019, which stated it is Executive Branch policy to enforce Title VI of the Civil Rights Act of 1964 against anti-Semitism.  84 Fed. Reg. 68779.  EO2 echoes that policy pronouncement and adds that Executive Branch policy is also to use "all available and appropriate legal tools, to prosecute, remove, or otherwise hold to account the perpetrators of unlawful anti-Semitic harassment and violence."  EO 14188, Sec. 2.  As with

EO1, EO2 consists mainly of internal directives to departmental and agency heads to advance the EO's policy aims. EO2, Sec. 3(a)-(b), (d)-(e). It also "encourage[s]" the Attorney General "to employ appropriate civil-rights enforcement authorities . . . to combat anti-Semitism," EO2, Sec. 3(b), and directs that implementation of the EO be "consistent with applicable law." EO2, Sec. 4(b).

## ARGUMENT

### I.    Re-framed As a Habeas Claim Challenging Taal's Hypothetical Future Detention, The Court Still Lacks Jurisdiction To Review Plaintiffs' Claims

On March 27, 2025, minutes after the Court determined that Plaintiffs failed to establish subject matter jurisdiction to enjoin Taal's removal proceedings and accordingly denied Taal's first two TRO motions, ECF No. 40 at 3-4, Plaintiffs filed a third TRO motion. ECF No. 41 at 7-10. As demonstrated below, Plaintiffs' arguments on this third go-around suffer from the same defects as before: all questions regarding an alien's removability may only be heard in removal proceedings and then reviewed in a petition for review challenging the removal order in the federal court of appeals. This Court continues to lack jurisdiction to consider Plaintiffs' claims challenging the decision to commence removal proceedings, as well as ICE's decision whether to detain pursuant to those proceedings. The Court should deny the TRO motion.

#### A.  Taal Cannot Raise a Habeas Claim Because He Is Not Now In ICE Custody And Is Not Yet Subject To a Final Removal Order

Taal now seeks a specific remedy—habeas. But this Court only has the power to grant that remedy pursuant Section 2241 when a petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." *Kapoor v. DeMarco*, --- F.4th ---, 2025 WL 908234, at *7 (2d Cir. Mar. 26, 2025); *see* 28 U.S.C. § 2241. A habeas petitioner must file within the district of confinement to invoke a federal court's habeas "jurisdiction." *Rumsfeld v.*

*Padilla*, 542 U.S. 426, 430, 435, 447 (2004).  Of course, Taal concedes, as he must, that he is not physically in ICE custody.  *See* ECF No. 41-1 at 9.  That is dispositive:  There is no such thing as a prophylactic writ of habeas corpus; it is a discrete remedy, to deal with actual confinement. Taal therefore cannot properly file a habeas petition, let alone file one in a district of confinement, thus defeating federal habeas jurisdiction.

Nevertheless, Taal claims that he is "in custody" for habeas purposes because in his view, physical detention is not required, and he is currently "subject to restraints not shared by the general public."  ECF No. 41-1 at 8-10.  He is wrong.  And the cases he cites are distinguishable because they do not address his factual circumstances.  None of those cases involve a former nonimmigrant visa holder who now lacks lawful immigration status, who is not in ICE custody, and is under no order dictating his detention, nor any order restricting his movements.

First, Taal's quote from *Preiser v. Rodriguez*, 411 U.S. 475, 487 (1973), is inapposite. ECF No. 41-1 at 8.  That language pertained to petitioners who *were detained* and "alleged that the deprivation of their good-conduct-time credits" illegally lengthened their confinement. *Preiser*'s language about "future confinement" and "future releases" relates to the availability of habeas to challenge the duration of petitioners' existing detention—not, like here, the claimed ability to challenge anticipated future detention.  *Id*. at 487-88.

Second, *Hensley* held that the plaintiff's liberty had been restrained because "the conditions imposed on petitioner as the price of his release constitute 'custody.'"  *Hensley v. Mun. Ct., San Jose Milpitas Jud. Dist., Santa Clara Cnty., California*, 411 U.S. 345, 348 (1973). Here, however, there is no order placing any condition or restraint on Taal, and none of the cases he cites to support his theory that he is in custody are relevant.

Finally, Taal's reliance on *Ragbir* and *Simmonds* to suggest he is in custody for habeas purposes is also misplaced. In those cases, unlike here, the habeas petitioners were subject to final orders of removal. Further, as Taal acknowledges, regarding custody, the *Ragbir* court explained, "fac[ing] imminent deportation, which necessarily involves a period of detention . . . effects a present, substantial curtailment of . . . liberty." ECF No. 41-1 at 10 (quoting *Ragbir v. Homan*, 923 F.3d 53, 75-76 (2d Cir. 2019)). As this Court found, unlike the habeas petitioner in *Ragbir*, Taal is not subject to a final order of removal. ECF No. 40 at 4. Indeed, he has not yet even appeared before an immigration judge, as he has continued to evade service. Thus, *Ragbir* and similar cases offer no support for Taal's claim that he is in custody for habeas purposes.

Because Taal fails to meet his burden to show that he is custody, he cannot prevail on a habeas claim. S*ee Skaftouros v. United States*, 667 F.3d 144, 158 (2d Cir. 2011) (habeas petitioner must prove that he is in custody by a preponderance of the evidence).

### B. Distinguished From Challenges To The Lawfulness Of Detention Itself, The Court Lacks Jurisdiction Over The Government's Initial Decision to Detain Aliens Placed in Removal Proceedings

Even if Taal were in custody for habeas purposes, the Court would lack jurisdiction over his current claims challenging ICE's initial decision to detain him. A decision to detain Taal would be governed by 8 U.S.C. § 1226(a), the statute that authorizes detention pending a final decision in removal proceedings. The INA explicitly bars judicial review of the discretionary decision whether to detain someone placed in removal proceedings. Section 1226(e) provides that: "The Attorney General's discretionary judgment regarding the application of [§ 1226] shall not be subject to review. No court may set aside any action or decision by the Attorney General

under this section regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."[12]  8 U.S.C. § 1226(e).

Section 1226(e) would bar jurisdiction over the initial decision to detain Taal.  *See Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (finding that § 1226(e) did not bar review because the petitioner did not challenge "his initial detention").  While Taal, if detained, could still challenge the lawfulness of his detention in a habeas petition filed in an appropriate federal district court, Section 1226(e) would preclude using such a vehicle to challenge ICE's decision whether to detain him in the first place; the habeas petition, rather, would be limited to core habeas challenges: assessing the lawfulness of his detention or, if appropriate, the conditions of confinement.  *See Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 119 (2020) (the core of habeas is remedy for unlawful executive detention, and claims outside of this core may not be pursued via habeas); *see also Munaf v. Geren*, 553 U.S. 674, 693 (2008); *Skinner v. Switzer*, 562 U.S. 521, 535, n. 13 (2011).

In his TRO motion, Taal makes no mention of the jurisdictional bar in Section 1226(e), which prevents the Court from reviewing any future decision by ICE to detain Taal (as opposed to core habeas review, detailed below).  On this basis as well, the Court lacks jurisdiction to enter the TRO Taal seeks in the current procedural posture.

---

[12]  The functions of the Immigration and Naturalization Service were transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135.  The transfer occurred on March 1, 2003.  Following this transfer, ICE, a component of DHS, not the Attorney General, is responsible for initial custody determinations. Custody determinations may be reviewed in certain circumstances by immigration judges.  *See generally* 8 C.F.R. § 1003.19.

### C.  Taal Cannot Use a Habeas Petition To Challenge His Possible Future Detention; Taal Must Wait Until He Is Detained To Raise That Challenge

Taal's current effort to re-frame his challenge as one involving his possible future *detention* attendant to removal proceedings fails to acknowledge and cannot overcome this Court's determination that it lacks jurisdiction to enjoin commencement of Taal's removal proceedings.  ECF No. 40 at 3-4.

In their most recent TRO motion, Plaintiffs raise additional constitutional challenges, alleging that Taal's detention would violate the First and Fifth Amendments.  *See* ECF No. 41-1 at 10-17.  The Court, however, has already held that Plaintiffs failed to establish jurisdiction to entertain such constitutional challenges.  *See* ECF No. 40 at 3-4; *see also* ECF No. 2-5 at 12-18. The same is true with respect to Plaintiffs' current motion.  Plaintiffs argue that any future detention by ICE will violate Taal's First Amendment rights, *see* ECF No. 41-1 at 10-15, and his Fifth Amendment right to due process.  *See* ECF No. 41-1 at 15017.  But Taal anticipates that this detention will arise in the context of removal proceedings and his arguments challenging that detention will fundamentally be arguments challenging being placed into removal proceedings at all, so Section 1252(b)(9) bars those claims.  *See* ECF No. 40 at 3-4; *see also* 8 U.S.C. § 1252(b)(9); *Jennings v. Rodriguez,* 138 S. Ct. 830, 841 (2018) (Section 1252(b)(9) includes challenges to the "decision to detain [alien] in the first place or to seek removal," which precedes any issuance of an NTA); *Nasrallah v. Barr*, 590 U.S. 573, 580 (2020) (the REAL ID Act clarified that removal orders may not be reviewed in district courts, "even via habeas corpus," and may be reviewed only in the courts of appeals).  The jurisdictional bar of Section 1252(b)(9) "is not limited to challenges to singular orders of removal or to removal proceedings simpliciter."  *Aguilar v. Immigration and Customs Enforcement*, 510 F.3d 1, 9 (1st Cir. 2007). Taal "cannot escape . . . [S]ection 1252(b)(9) by . . . banding together claims consigned by law to

13

administrative channels, declining to raise them within the ambit of removal proceedings per se, and maintaining those unexhausted claims do not implicate a particular removal determination." *Id.*

When and where can Taal raise his constitutional claims challenging the Government's efforts to remove him from the United States?  The answer is in removal proceedings and through any subsequent 8 U.S.C. § 1252(a) judicial review.  Taal's challenge to the constitutionality of his anticipated detention is essentially a challenge to the constitutionality of his removal proceedings, and to that extent, courts of appeals retain jurisdiction to review "constitutional claims or questions of law raised upon a petition for review" of a final removal order.  8 U.S.C. § 1252(a)(2)(D).  Indeed, claim-channeling provisions make explicit that, in the context of a removal proceeding, a court of appeals is the *only* forum to raise such issues.  8 U.S.C. §§ 1252(a)(5), (b)(9), (g).  Particularly relevant here, as Defendants previously noted (ECF No. 30 at 15 n.11), aliens may challenge, including on constitutional and legal grounds, the basis of their immigration arrests, and the lawfulness of the removal proceedings themselves, through a motion to terminate removal proceedings at their first immigration court appearance. *See Medley v. Garland*, 71 F.4th 35, 42-43 (2d Cir. 2023) (discussing, among other cases, *Rajah v. Mukasey*, 533 F.3d 427, 446 (2d Cir. 2008), which identified "possible remedies" for "significant regulatory violations" that occurred during the arrest phase of removal proceedings); *see also generally, e.g., Sanchez v. Sessions*, 904 F.3d 643, 649 (9th Cir. 2018).  A properly filed motion to terminate removal proceedings made before the immigration judge preserves the issue for review in an appropriate court of appeals, if other claim-preservation requirements are satisfied.

How can Taal challenge his immigration detention, if ICE detains him?  If and when ICE detains Taal, he may seek administrative review of his custody status.  After an alien is detained by ICE under 8 U.S.C. § 1226(a), the alien may request review of that custody determination by an immigration judge.  8 C.F.R. § 1236.1(d)(1); *see generally* 8 C.F.R. § 1003.19 (establishing procedures for review of custody determinations by immigration judges).  The immigration judge may order release under certain conditions.  8 U.S.C. § 1226 (a)(1)-(2); 8 C.F.R. § 1236.1(d)(1).  An alien may appeal an immigration judge's custody determination to the Board of Immigration Appeals.  8 C.F.R. §§ 1003.19(f).  As discussed above, discretionary decisions of immigration judges and the Board of Immigration Appeals regarding custody are not subject to judicial review.  8 U.S.C. § 1226(e) ("No court may set aside any action or decision by the Attorney General under [Section 1226] regarding the detention of any alien . . . .").  And separately, while aliens in detention may raise habeas challenges to unreasonably and unconstitutionally prolonged detention, *see Velasco Lopez*, 978 F.3d at 850, such circumstances are certainly not at issue here where Taal has yet to be detained.  But there is no jurisdiction to entertain Taal's preemptive challenge to his anticipated future detention.

Notwithstanding the foregoing, reiterating his reliance on *Ragbir*, Taal argues that he can assert a habeas claim to avoid detention and removal.  ECF No. 41 at 7-8 (citing *Ragbir*, 923 F.3d at 74).  But, as this Court already held, *Ragbir* does not provide the Court jurisdiction to review Taal's non-habeas claims related to his removal proceedings, ECF No. 40 at 3-4, nor does it authorize preemptive judicial review of his potential future detention attendant to those proceedings.  *See Ragbir*, 923 F.3d at 63-66.  Taal also reasserts that under *Ragbir* he can petition for habeas relief, but that case was vacated and remanded under *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020).  Given its vacatur, *Ragbir* is no longer precedential, but

rather persuasive inasmuch as it remains good law.  *See Sajous v. Decker*, No. 18-cv-2447
(AJN), 2018 WL 2357266 (S.D.N.Y. 2018) (citing *Brown v. Kelly*, 09 F.3d 467, 476-477 (2d
Cir. 2010)).  It is not persuasive on the habeas point because in *Thuraissigiam*, the Supreme
Court made clear that habeas may not be used to "claim the right to enter or remain in a
country." *Thuraissigiam*, 591 U.S. at 117.  So, under *Ragbir* and *Thuraissigiam*, Taal cannot
seek pre-enforcement habeas relief.  And as this Court determined, unlike the plaintiff in *Ragbir*,
once Taal is placed into removal proceedings, he will have the opportunity to raise his
constitutional challenges before the immigration court and, if he exhausts administrative
remedies, before a U.S. court of appeals.  *See generally* ECF No. 40 at 4.  Again, Plaintiffs do
not even acknowledge this Court's prior opinion, let alone try to explain why it is wrong on this
score.  Nor could they.

Taal also contends that 8 U.S.C. § 1201(i) affords this Court jurisdiction to review his
visa revocation, and that he may seek review of that revocation through habeas.  ECF No. 41 at
7.  That too is wrong.  Taal misreads a key part of the statute providing exactly the opposite.
After the issuance of a visa, a "consular officer or the Secretary of State may at any time, in his
discretion, revoke such visa or other documentation," and "[t]here shall be no means of judicial
review (including review pursuant to section 2241 of title 28 or any other habeas corpus
provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, *except
in the context of a removal proceeding* if such revocation provides the sole ground for removal
under section 1227(a)(1)(B) of this title."  8 U.S.C. § 1201(i) (emphasis supplied).  Taal
advances the novel interpretation that Section 1201(i)'s preclusion of judicial (including habeas)
review over revocation decisions is meant to *confer* habeas jurisdiction on a district court *during*
removal proceedings.  ECF No. 41 at 7.  But that reading cannot be right, because it would

nullify Congress's claim-channeling and jurisdiction-stripping provisions. It is also squarely at odds with *Thuraissigiam*'s clarification that the scope of habeas jurisdiction *not* channeled by section 1252 *excludes* "the right to enter or remain" in the country—*i.e.*, the very definition of the challenge that Taal raises in this Court regarding his visa revocation. *Thuraissigiam*, 591 U.S. at 117. Thus, Taal may receive review of that revocation only in removal proceedings once instituted by ICE, which will provide him with the process and procedure Congress said he is due. 8 U.S.C. § 1252(a). And if he is ordered removed, he may follow procedures to seek appellate court review. *Id.* Which is to say, Taal can obtain the requested merits review of these issues in the only forum Congress designated for that purpose, but he has so far avoided service of the NTA commencing removal proceedings. *See* 8 U.S.C. §§ 1252(a)(5), (b)(9), & (g). Moreover, given Taal's lack of lawful immigration status, any review of the Executive Orders would not redress this asserted injury; he is subject to the commencement of removal proceedings and potential detention with or without those Orders.

### D. This Court Lacks Jurisdiction To Dictate The Location Of Taal's Future Potential Detention

This Court also lacks jurisdiction over ICE's discretionary decision concerning where to detain aliens in immigration detention, and thus the Court lacks authority to enjoin Taal's potential transfer to a different location if ICE detains him. Like earlier iterations of Plaintiffs' claims, this argument (*e.g.*, ECF No. 43-1 ¶ 2) amounts to a challenge to the commencement of removal proceedings over which this Court lacks jurisdiction under 8 U.S.C. § 1252(g) because decisions relating to commencement of proceedings necessarily includes the method by which they are commenced. *See Alvarez v. ICE*, 818 F.3d 1194, 1202 (11th Cir. 2016) (recognizing that the three actions listed Section 1252(g)—commence proceedings, adjudicate cases, and execute removal orders—"represent the initiation or prosecution of various stages in the

deportation process," and "[a]t each stage the Executive has discretion to abandon the endeavor" for any number of reasons) (citing *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 483 (1999)). The commencement of proceedings requires ICE to determine whether, when, and where to commence such proceedings, meaning that Section 1252(g) bars this Court's review of ICE's decision where to initiate removal proceedings. *See, e.g.*, *Alvarez*, 818 F.3d at 1203 ("The challenge to ICE's decision, made by its counsel, Defendant Emery, essentially asks this Court to find that the agency should have chosen a different method of commencing proceedings. The district court was correct to find that Section 1252(g) strips us of the power to entertain such a claim."); *Arostegui v. Holder*, 368 F. App'x 169, 171 (2d Cir. 2010) (holding, upon a petition for review of a final removal order: "Whether and when to commence removal proceedings is within the discretion of DHS, and we do not have jurisdiction to review such decisions . . . .") (citing 8 U.S.C. § 1252(g)).[13]

Additionally, the Executive's authority under 8 U.S.C. § 1231(g) to decide the location of detention for individuals detained pending removal proceedings falls within the review bar in 8 U.S.C. § 1252(a)(2)(B)(ii). That is because, under Section 1231(g), ICE "necessarily has the authority to determine the location of detention of an alien in deportation proceedings," including whether to change that location during the pendency of proceedings. *Gandarillas-Zambrana v. Bd. Immigration Appeals*, 44 F.3d 1251, 1256 (4th Cir. 1995); *see, e.g.*, *Wood v. United States*, 175 F. App'x 419, 420 (2d Cir. 2006) (holding that the Secretary "was not required to detain [Plaintiff] in a particular state" given the Secretary's "statutory discretion" under Section 1231(g)). Thus, a district court may not exercise jurisdiction over ICE's decision to detain an

---

[13] Though not relevant here, the Courts of Appeals retain jurisdiction over constitutional questions and questions of law on review of agency decisions in removal proceedings. *See* 8 U.S.C. § 1252(a)(2)(D).

alien in a given location, and may not order ICE to transfer an alien from one location to another. *See, e.g.*, *Salazar v. Dubois*, No. 17-cv-2186 (RLE), 2017 WL 4045304, at *1 (S.D.N.Y. Sept. 11, 2017) (concluding that the district court "does not have authority to issue an order to change or keep [an alien] at any particular location"); *Zheng v. Decker*, No. 14-cv-4663 (MHD), 2014 WL 7190993, at *15-16 (S.D.N.Y. Dec. 12, 2014) (denying petitioner's request that the Court order ICE not to transfer him to another jurisdiction, holding that Section 1231(g) transfer authority "is among the [Secretary of Homeland Security's] discretionary powers. The INA precludes judicial review over such discretionary decisions. *See* 8 U.S.C. § 1252(a)(2)(B)(ii) (barring district courts from exercising subject matter jurisdiction over "any . . . decision or action of the Attorney General . . . the authority for which is specified under this subchapter [8 U.S.C. §§ 1151-1381] to be in the discretion of the Attorney General . . .").

## II.     Plaintiffs' Motion Fails On The Merits

Federal Rule of Civil Procedure 65 governs this motion, and the standard for issuance of temporary restraining orders and preliminary injunctions is the same. *See Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 124-25 (N.D.N.Y. 2022); *Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, PAA Chapter*, 306 F.2d 840, 842 (2d Cir. 1962). The injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter v. NRDC*, 555 U.S. 7, 22 (2008), and the burden is squarely on Plaintiffs. *See Moore v. Consolidated Edison Co. of N.Y., Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). In addition to Plaintiffs' burdens to show likelihood of success on the merits, Plaintiffs must also show likelihood of irreparable harm, that equity balances in their favor, and that an injunction is also in the public interest. *See N.Y. Progress and Protection PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013). When the Government is a party to the suit, the balance of equities factor merges

with the inquiry into the public interest. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

### A.  Plaintiffs Cannot Show a Likelihood Of Success On The Merits

Even assuming that Plaintiffs have alleged a habeas claim over which this Court has jurisdiction, they nonetheless fail to establish that they are likely to succeed on the merits. *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *accord Yang v. Kosinski*, 960 F.3d 119, 127 (2d Cir. 2020).  Plaintiffs' claims that Taal's detention would violate Taal's "right to be free from First Amendment retaliation" and "constitute viewpoint discrimination" are a semantic repackaging of the First Amendment claims in Plaintiffs' first TRO motion and are likewise without merit for the reasons Defendants (at ECF 30 at 20-24) have already explained.  *Compare* ECF No. 41-1 at 10-15 *with* ECF No. 2-5 at 12-18.  The EOs are not retaliatory and do not constitute discrimination on the basis of speech.  Rather, they are purely directives to executive agencies.  *See* EO1 sec. 2(a)-(c), 3(a)-(g); EO2 sec. 3(a)-(e).  Nothing in the EOs permits or requires Taal to be deported because of protected speech.  ECF No. 41-1 at 10-15.  The EOs, by their terms, are focused on *conduct,* just as Cornell University focused on Taal's conduct when it twice suspended Taal and expelled him from its campus.  *See* ECF No. 33-1.  Moreover, the EOs do not purport to expand the inadmissibility or deportability grounds and are to "be implemented consistent with applicable law."  EO1 sec. 4(b); EO2 sec. 4(b).

Plaintiffs allege that Taal's detention would violate due process because the Government has not demonstrated that he is a danger or a flight risk, but he has not made a clear case for habeas relief.  *See* ECF No. 38 pp 38-39; Doc 41-1 pp 15-17; *Lucas v. Hadden*, 790 F.2d 365, 367 (3d Cir. 1986).  "Detention of aliens pending their removal in accordance with the INA is constitutional and is supported by legitimate governmental objectives."  *Hope v. Warden York*

*Cnty. Prison*, 972 F.3d 310, 328–29 (3d Cir. 2020) (citing *Demore v. Kim*, 538 U.S. 510, 531 (2003), and *Wong Wing v. United States*, 163 U.S. 228, 235 (1896)). Indeed, the Supreme Court "has firmly and repeatedly endorsed the proposition that Congress may make rules as to aliens that would be unacceptable if applied to citizens." *Demore*, 538 U.S. at 522. It underscores that "any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government." *Id.* at 522–23. Accordingly, the Supreme Court has long held that "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Id.* at 522–23. This has resulted in the Supreme Court ruling that individuals held during the pendency of removal proceedings may be detained even without an individualized determination as to flight risk or dangerousness. *See, e.g., Carlson v. Landon*, 342 U.S. 524, 528–34, 538 (1952); *Wong Wing*, 163 U.S. at 235 (holding deportation proceedings "would be vain if those accused could not be held in custody pending the inquiry into their true character.").

Plaintiffs next assert that there is no legitimate purpose for Taal's detention. Doc 41-1 at 15-16. But Congress "empowers the Secretary of Homeland Security [through 8 U.S.C. § 1226(a)] to arrest and hold an alien 'pending a decision on whether the alien is to be removed from the United States.'" *Nielsen v. Preap*, 586 U.S. 392, 397 (2019) (quoting 8 U.S.C. § 1226(a)). Congress also empowers the Secretary with "the discretion either to detain the alien or to release him on bond or parole." *Id.* As discussed above, the Court lacks jurisdiction to consider challenges to the Government's decision to detain an alien in removal proceedings. 8 U.S.C. § 1226(e). The proper vehicle for Taal to challenge his detention, if and when it commences, is to seek review of his detention in immigration court if appropriate. 8 C.F.R. § 1003.19(h)(2)(ii). If adverse, Taal may seek administrative review of that determination.

8 C.F.R. § 1003.19(f).  And he may file a habeas petition if warranted.  But he cannot raise that challenge in this Court in this case at this time because he is not detained.

### B.  Plaintiffs Will Not Be Irreparably Harmed Absent a TRO

As before, Plaintiffs also cannot establish the irreparable harm necessary to warrant extraordinary relief. *See St. Joseph's Hospital Health Center v. American Anesthesiology of Syracuse, P.C.*, __ F.4th __ , 2025 WL 794367 (2d Cir. 2024).

First, Plaintiffs argue that Taal's detention alone would constitute an irreparable injury. *See* ECF No. 41-1 at 18-19.  Not so.  Congress provided that an alien "may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  *See* 8 U.S.C. § 1226(a).  And if Taal is detained, the INA provides a mechanism to request to challenge his detention before an immigration judge and the Board of Immigration Appeals.  *See* 8 C.F.R. §§ 236.1(b) & (d); 8 C.F.R. § 1003.19.  Thus, his detention is contemplated by the INA, and he has avenues to challenge his detention under the law.  And if he desires, if and when ICE detains him, Taal may also petition for a writ of habeas corpus in a federal district court with venue over his immediate custodian to contest the lawfulness of his detention.[14]  *See Rumsfeld v. Padilla*, 542 U.S. 426 (2004).  The harm he fears is not irreparable.

Second, Plaintiffs seem to argue that because they have merely *alleged* a constitutional injury, then they somehow are entitled to a *presumption* of irreparable harm.  ECF No. 41-1 at 19.  But that cannot be true.  Plaintiffs must show a likelihood of success on the merits of their constitutional claim for the alleged injury to even qualify as harm.  *See Vincenty v. Bloomberg*,

---

[14] The Government does not concede that a federal district court would automatically have jurisdiction over the entirety of Taal's future habeas petition, especially if he raises claims outside of "core" habeas challenges. The Government respectfully reserves the right to raise any appropriate defense to a habeas petition Taal my file in the future.

476 F.3d 74, 83 (2d Cir. 2007) ("A motion for a preliminary injunction that would prohibit a government from taking action in furtherance of the public interest pursuant to a statutory or regulatory scheme should not be granted unless the moving party demonstrates both a likelihood of success on the merits, and the likelihood of irreparable harm if an injunction is not granted."). The mere act of alleging injury cannot somehow short-circuit the Court from conducting the irreparable-harm inquiry.  As discussed above and previously (ECF No. 30 at 20-24), Plaintiffs are not likely to succeed on the merits of their constitutional claim, so, under their own formulation of the standard, they have not established any harm, much less irreparable harm.

Finally, an assertion of irreparable injury (as in Taal's second TRO request) arising from access-to-counsel concerns, would be unsubstantiated here.  Taal is not currently co-located with his counsel in this case.  *See* ECF No. 41-2 (Declaration of Plaintiffs' counsel Eric Lee, stating counsel's location as Southfield, Michigan); ECF No. 41-3 (Declaration of Momodou Taal, stating residence as Tompkins County, New York).  And, if he is not yet represented in connection with removal proceedings, the allegation of anticipated difficulties retaining counsel co-located with his detention facility would be speculative.  *See* 8 U.S.C. § 1362 (providing that "[i]n any removal proceedings before an immigration judge . . . the person concerned shall have the privilege of being represented (at no expense to the Government) by such counsel, authorized to practice in such proceedings, as he shall choose."); 8 C.F.R. § 1292.1.

### C.  The Government and Public Will Be Injured by a TRO

A TRO would harm Defendants and not serve the interests of the public.  As the Supreme Court has stated, there is always a public interest in prompt execution of removal orders.  *Nken v. Holder*, 556 U.S. 418, 436 (2009); *id.* at 427; *see also* Sen. Jud. Committee Rep. No. 104-249 at 7, 1996 WL 180026 ("If the United States is to have an immigration policy that is both fair and

effective, the law and the commitment of those with the duty to apply or enforce it must be clear

. . . . Aliens who violate U.S. immigration law should be removed from this country as soon as

possible."); *Lucacela v. Reno*, 161 F.3d 1055, 1059 (7th Cir. 1998) (noting the "clear public

interest (as expressed by Congress) in deporting illegal aliens without delay," and acknowledging

that "Congress made it clear . . . that public policy has now shifted to enforcing deportation

orders immediately"). Specifically, Congress has expressed its disapproval of the unwarranted

delays in the effort to remove noncitizens who lack lawful status promptly. "Existing procedures

to deny entry to and to remove illegal aliens from the United States are cumbersome and

duplicative. Removal of aliens who enter the United States illegally, even those who are ordered

deported after a full due process hearing, is an all-too-rare event." H. R. Rep. No. 104-469(I), at

107 (1996), 1996 WL 168955. The detention of aliens throughout the pendency of their removal

proceedings also allows for more expedient removal proceedings. *See Demore v. Kim*, 538 U.S.

510, 519 (2003) (quoting an Inspector General report stating that "[d]etention is key to effective

deportation").

Here, Taal is attempting to forestall his detention and removal proceedings without even

allowing the removal process to play out as Congress intended. If every alien evaded service of

the NTA and attempted to preemptively enjoin the statutory removal process, including detention

attendant to that removal process, the entire immigration system would grind to a halt. That

cannot be what Congress intended and would plainly not be in the public interest.

Finally, the Court should order security with any preliminary injunction. Under Rule

65(c), the Court may issue a preliminary injunction "only if the movant gives security" for

"costs and damages sustained" by Defendants if they are later found to "have been wrongfully

enjoined." Fed. R. Civ. P. 65(c). If the Court issues an injunction, the Court should require

Plaintiffs to post an appropriate bond commensurate with the injunction's scope. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## **CONCLUSION**

Like his earlier attempts to block commencement of removal proceedings, Taal's most recent challenge to removal-related detention must also be brought in accordance with the channeling provisions Congress designed. If ICE later detains him, he can challenge his detention administratively before an immigration judge and also can file a habeas petition in a federal district court with venue over his immediate custodian to challenge the lawfulness of his detention. But his *preemptive* challenge to his anticipated detention pursuant to removal proceedings lacks merit. Which is to say, when it comes to the claims pending before the Court, now is not the time and this Court is not the place. For these reasons and the reasons shown in Defendants' opposition to the previous two TRO motions, ECF No. 30, the Court should deny Plaintiffs' third TRO request.

And to facilitate a resolution of Taal's claims on the merits in the proper forum rather than extending the cycle of TRO motion after TRO motion where jurisdiction is clearly lacking, Defendants respectfully propose, given the jurisdictional infirmities the Court identified in its March 27, 2025 order, and which the Amended Complaint and third TRO motion did not cure, that the Court order Taal to show cause why this case should not be dismissed for lack of jurisdiction.

///

///

25

March 31, 2025                              Respectfully Submitted,

                                           YAAKOV M. ROTH
                                           Acting Assistant Attorney General

                                           DREW C. ENSIGN
                                           Deputy Assistant Attorney General

                                           AUGUST E. FLENTJE
                                           Acting Director

                                           EREZ REUVENI
                                           Acting Deputy Director

                                           /s/ *Ethan Kanter*
                                           ETHAN KANTER
                                           Chief, National Security Unit
                                           Office of Immigration Litigation
                                           P.O. Box 878, Ben Franklin Station
                                           Washington, DC 20001

                                           PAUL STONE
                                           Deputy Chief, National Security Unit

                                           BENJAMIN MARK MOSS
                                           Senior Litigation Counsel

                                           JOHN A. SARCONE III
                                           United States Attorney

                                           KAREN LESPERANCE
                                           Chief, Civil Division
                                           Office of the United States Attorney
                                           Northern District of New York

                                           *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2025, I electronically filed this response with the Clerk of the Court for the United States District Court for the Northern District of New York by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: _/s/ Ethan Kanter_
     ETHAN KANTER