UNITED STATES  DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x
MOMODOU TAAL, MUKOMA WA NGUGI, and
SRIRAM PARASURAMA,

                              Plaintiffs,

vs.                              3:25-CV-335

DONALD J. TRUMP, in his official capacity
as President of the United States; U.S.
DEPARTMENT OF HOMELAND SECURITY;
and KRISTI NOEM, in her official capacity
as Secretary of the U.S. Department of
Homeland Security,

                              Defendants.
--------------------------------------------x

        Transcript of a Motion Hearing held on

March 25, 2025, at the James Hanley Federal

Building, 100 South Clinton Street, Syracuse,

New York, the HONORABLE ELIZABETH C. COOMBE,

United States District Judge, Presiding.

                *Jodi L. Hibbard, RMR, CSR, CRR*
            *Official United States Court Reporter*
                   *100 South Clinton Street*
                 *Syracuse, New York  13261-7367*
                       *(315) 234-8547*

A P P E A R A N C E S

For Plaintiffs:        ERIC T. LEE, ESQ.
                       Attorney at Law
                       24225 W 9 Mile Road - Suite 140
                       Southfield, Michigan  48033

                       DAVIS NDANUSA IKHLAS & SALEEM LLP
                       Attorneys at Law
                       26 Court Street - Suite 603
                       Brooklyn, New York  11242
                         BY:  MOHAMMAD A. SALEEM, ESQ.

                       AMERICAN-ARAB ANTI-DISCRIMINATION COMM.
                       910 17th St. NW - Suite 1000
                       Washington, D.C.  20006
                         BY:  CHRISTOPHER GODSHALL-BENNETT, ESQ.

For Defendants:        DEPARTMENT OF JUSTICE - CIVIL
                       Ben Franklin Station
                       P.O. Box 868
                       Washington, D.C.  20044
                         BY:  ETHAN B. KANTER, ESQ.
                              BENJAMIN M. MOSS, ESQ.

                       OFFICE OF U.S. ATTORNEY
                       NORTHERN DISTRICT OF NEW YORK
                       445 Broadway, Room 218
                       Albany, New York  12007
                         BY:  KAREN FOLSTER LESPERANCE, ESQ.
                              JOHN SARCONE, U.S. ATTORNEY

1                    (Open Court, 2:00 p.m.)

2                    COURTROOM DEPUTY:  The court calls Taal, et al.

3        versus Trump, et al., Case Number 3:25-CV-335.  Can I have

4        the appearances for plaintiff, please.

5                    MR. LEE:  Good morning -- good afternoon, your

6        Honor, Eric Lee for the plaintiffs, and I'm here with my

7        co-counsels.

8                    THE COURT:  Good afternoon.

9                    MR. GODSHALL-BENNETT:  Good afternoon, Chris

10       Godshall-Bennett, American-Arab Anti-Discrimination

11       Committee.

12                   THE COURT:  Good afternoon.

13                   MR. SALEEM:  Good afternoon, Judge, Mohammad Saleem

14       for the plaintiffs.

15                   THE COURT:  Good afternoon.

16                   COURTROOM DEPUTY:  And for defendants?

17                   MR. KANTER:  Ethan Kanter, United States Department

18       of Justice, for the government defendants.

19                   MR. MOSS:  Good afternoon, your Honor, Benjamin

20       Mark Moss from United States Department of Justice for the

21       defendants.

22                   MS. LESPERANCE:  Good afternoon, your Honor, Karen

23       Lesperance from the United States Attorney's Office for the

24       defendants.

25                   MR. SARCONE:  John Sarcone, United States Attorney,

*Taal, et al. v. Trump, et al.- 3/25/25*                4

1    good afternoon, your Honor.

2              THE COURT:  Good afternoon, everyone.  Good

3    afternoon, and welcome to everyone in the gallery.  The

4    federal courts are open and you are very welcome to observe

5    the hearing this afternoon, but your observance must be

6    quiet.  That is necessary so that the lawyers and I can do

7    the important work that we need to do in this case.

8    Disturbances will not be tolerated, and anyone disrupting

9    this hearing will be removed.

10             Good afternoon again to all of the attorneys and

11   thank you for your hard work briefing this case over the

12   weekend.  The court has reviewed everything that you have

13   filed and done its best to digest it all, given the time

14   constraints.

15             This is a hearing on the motions for temporary

16   restraining orders filed by the plaintiffs.  I want to note

17   that during this hearing, I will refer to Executive Order

18   Number 14161, *protecting the United States from foreign*

19   *terrorists and other national security and public safety*

20   *threats*, as Executive Order 1, and Executive Order Number

21   14188, *additional measures to combat anti-Semitism*, as

22   Executive Order 2.  That is what the plaintiffs did in their

23   submissions, I know that was not the practice of the

24   government.  If it's possible for you to use those shorthand

25   today, I think that would make the proceeding easier for

1    everyone.

2            According to affidavits submitted by the government

3    on Saturday night, Mr. Taal's visa was revoked the day before

4    he filed his lawsuit.  The court wants to hear from both

5    sides about how that affects the TRO motions presently

6    pending before the court.  But it appears to the court that

7    Mr. Taal will be able to challenge both the revocation of his

8    visa and the commencement of the removal proceedings during

9    the impending removal proceeding.  It also appears to the

10   court that if there is a final order of removal, then he

11   would be able to appeal that to the appropriate court of

12   appeals.  Of course, the court wants to hear from both sides

13   on those issues.

14            It also appears to the court that the Immigration

15   and Naturalization Act bars this court from exercising

16   jurisdiction to hear Mr. Taal's challenges to the revocation

17   of his visa and the commencement of the removal proceedings.

18   But, as mentioned already, it also appears that he will be

19   able to raise those challenges during the removal

20   proceedings.

21            As I've said repeatedly, both parties will have an

22   opportunity to address these issues.  The court also plans to

23   address other topics during the hearing, but wanted to focus

24   on laying that groundwork for where we are today.

25            Plaintiff, it's your motion, Mr. Lee, will you be

1    arguing?

2              MR. LEE:  Yes, I will, your Honor.

3              THE COURT:  You have the burden of persuasion so

4    you may address the court first.  And before you start your

5    arguments focusing on the topics I've just covered, if you

6    could come -- I do have two specific questions for you.

7    Although I don't promise it will only be two, but I would

8    like to ask you -- yes, please, if you could come to the

9    podium.  Could you tell me whether the most recent TRO motion

10   is moot now that we're at this hearing today?

11             MR. LEE:  Your Honor, it's -- we don't believe that

12   it is, because the underlying legality of the removal order

13   is in question here.

14             THE COURT:  And could you also address whether your

15   most recent motion superseded your March 19th, 2025 ex parte

16   TRO motion?

17             MR. LEE:  No, your Honor, and I'd be happy to

18   explain all of the reasons why because I think they're really

19   at the core of the issue here.

20             THE COURT:  Please go ahead.  Thank you.

21             MR. LEE:  Well, your Honor's asked us to talk about

22   jurisdictional issues first so why don't I just get right

23   into *Reno v. AADC* and the *Ragbir* case because these -- there

24   are a number of reasons why the existence of 1252(g) does not

25   strip this court of jurisdiction.

*Taal, et al. v. Trump, et al.- 3/25/25*                7

1            There are a couple of main fundamental factual

2      distinctions between *AADC* and here that we'd like to bring

3      the court's attention to if we may.  The first of which is

4      that the six temporary residents who were plaintiffs in that

5      case were here, they were overstayed -- they were visa

6      overstays, pardon me, which meant that the selective

7      enforcement claim that they were bringing under the First

8      Amendment for the second reason, that the INS at that time

9      had deemed them removable, had nothing to do with the fact

10     that there was a legitimate ground of removability.  That's

11     not the case here.  There's only one basis that the

12     government alleges is the ground of removability and they

13     admitted in their declarations that it's because Mr. Taal

14     attended one protest in October -- in August 2024.  That is

15     not in the INA, there is no ground of removability that says

16     that an individual can be removed because they, if I can

17     quote from the declaration from Officer Stanley, that he was

18     unreasonably loud, that he was disorderly, that there was too

19     much noise from the protest he attended.  They openly

20     acknowledge at page -- paragraph 9 of that declaration that

21     Mr. Taal's involvement in certain protests at Cornell align

22     with the EO's focus on deporting individuals who perpetuate

23     unlawful anti-Semitic harassment.  His involvement in those

24     disruptive protests is what rendered him removable, not under

25     the INA but under these two Executive Orders working

*Taal, et al. v. Trump, et al.*- 3/25/25                    8

1     together.

2              Now, if I could draw the court's attention to

3     *Ragbir v. Homan*.  Now that was a case where the court set a

4     very clear -- the Second Circuit set a very clear standard

5     for determining when a -- the commencement of proceedings or

6     in that case I believe it was a final order of removal, is

7     outrageous.  And here, it clearly is for a couple of reasons.

8     This is the apex of First Amendment activity.  Mr. Taal

9     attended a protest.  There could be nothing more important to

10    protect under the First Amendment than that.  He's a

11    noncitizen but he's a resident with substantial connections,

12    case law from the Supreme Court says very clearly that he has

13    the protection of the First Amendment while he's here and

14    while that protest took place on U.S. soil.  So we're not

15    talking about noncitizens who are arriving for the first

16    time, defendants try and fudge the line on that a little bit,

17    that's an entirely different set of law.

18              There's obvious proof here of retribution.  In

19    *Ragbir*, the court said a plausible clear inference that

20    criticism and the individual's prominence played a

21    significant role in the attempt to remove him, and that's at

22    page 71 of that decision, was sufficient to meet that prong.

23    If Ravi Ragbir could establish it, Mr. Taal clearly can

24    because, again, the declaration that I just read from says

25    that it was because he attended certain protests.  It's clear

1    viewpoint discrimination, they're not attacking people who

2    attend protests in support of the present Administration, and

3    so we can satisfy that prong, too.

4              Relatedly, the punitive element, and in *Ragbir*,

5    again, like the plaintiffs in *AADC*, there actually was an

6    alternate ground of removability there, he had been convicted

7    of wire fraud I believe, and the court said that for that

8    reason, the government's ability to have the discretion,

9    sure, under some circumstances, national security reasons, et

10   cetera, and that was at the heart of the case in *AADC*, the

11   court was concerned about attacking the government's

12   discretionary power.  But the Department of Homeland Security

13   does not have the discretion to violate the First Amendment,

14   your Honor, and that's the fundamental difference between

15   this case and those.

16             There's another jurisdictional element that is --

17             THE COURT:  Mr. Lee, before you move on I'd like to

18   ask you a question about *Ragbir*.

19             MR. LEE:  Sure.

20             THE COURT:  Didn't the court in *Ragbir* talk about

21   the fact that Mr. Ragbir did not have access to an adequate

22   substitute to a writ or a writ itself, and isn't Mr. Taal's

23   situation different because he's at the beginning of a

24   removal proceeding where he would be able to raise

25   challenges?  Mr. Ragbir was at the end, there was a final

*Taal, et al. v. Trump, et al.- 3/25/25*          10

1    order of removal.

2           MR. LEE:  Right, and so no, it's not different

3    because the First Amendment does not allow the government to

4    put someone in detention for months or possibly longer.  I'm

5    an immigration lawyer, it takes a very long time to get to a

6    master -- to get to a merits hearing where you're able to

7    prevent all of that on the record.  If Mr. Taal is taken

8    away, a thousand miles away like Mahmoud Khalil was, the

9    Columbia student, the First Amendment cannot allow, if we're

10   talking about a noncitizen who has rights under the First

11   Amendment, who the government acknowledges only attended a

12   single protest and he was only there for about five minutes.

13   If you can put somebody in jail for months and make them wait

14   so that they can have -- or weeks even, or days, it would be

15   too much, because under *Roman Catholic Diocese v. Cuomo*, you

16   can establish irreparable injury if your First Amendment

17   rights are implicated or hindered for a much shorter period

18   of time.  So the point, the point that --

19           THE COURT:  So your position is that *Ragbir* should

20   apply to Mr. Taal even though that was a different, a very

21   different procedural posture, where there was a final order

22   of removal and there was no opportunity for Mr. Ragbir to

23   raise his arguments at that point in the immigration

24   litigation -- I should say removal proceeding?

25           MR. LEE:  That's absolutely right, your Honor, and

1    that's because the heart of this issue is about the chill to

2    First Amendment speech.  And if this weren't about that, then

3    I think that that point would be a lot more salient but the

4    problem here is that the government's whole Executive Order

5    is aimed at chilling speech.  That's not -- don't take our

6    word for it.  The President said, to all resident aliens who

7    join -- this is in the White House Fact Sheet, this is not a

8    campaign statement, this is the official White House

9    statement accompanying the Executive Order.  To all resident

10   aliens who -- that is, those who have First Amendment

11   rights -- who joined what he calls pro-jihadist protests --

12   which is not true -- we put you on notice, come 2025, we will

13   find you and we will deport you.  I will also quickly cancel

14   the student visas of all Hamas sympathizers on college

15   campuses which have been infested with radicalism like never

16   before.  Your Honor, those are statements which are

17   constitutionally, statutorily, and historically completely

18   beyond the pale.

19          We think that it merits a nationwide injunction

20   because the point that I'm driving at here, your Honor, is

21   that to make Mr. Taal go sit in a detention center where he

22   can't access his counsel, he can't access his friends and

23   family, is going to make 1.1 million student visa holders in

24   this country who have the right to criticize this

25   Administration under the First Amendment and the millions of

*Taal, et al. v. Trump, et al.- 3/25/25*                    12

1    green card holders, and U.S. citizens like our other two

2    plaintiffs here, who have a right under *Lamont v. Postmaster*

3    *General* to listen to those views, making them sit in jail for

4    weeks until they get a motion to terminate, making them do

5    briefing, making them hire immigration counsel, making the

6    immigration judge deny so they can appeal months and months

7    later to the board of immigration appeals, making them pay a

8    5, $10,000 bond, maybe even higher, making them wait until

9    they can finally get to a court of appeal where their ability

10   to present facts is going to be much more limited because

11   they never got to be in a District Court like this one.  The

12   First Amendment, your Honor, cannot, cannot allow that type

13   of a chill to be used by the Executive Branch.

14           THE COURT:  Mr. Lee, do you agree with the

15   government that Mr. Taal will have an opportunity to raise

16   any constitutional claims that he might have during the

17   removal proceedings?

18           MR. LEE:  Whether he can raise them months or years

19   from now --

20           THE COURT:  But my question was, do you --

21           MR. LEE:  Sure.

22           THE COURT:  My question was not when, my question

23   was whether you agree with the government that he will have

24   that opportunity.

25           MR. LEE:  That's correct, your Honor, under the

1    INA, the zipper clause of 1252 does ultimately, again, after

2    that very long and costly period of detention, give them that

3    right -- give him the right to eventually challenge those

4    issues.

5            THE COURT:  Well, the government then takes the

6    position in its brief at page 15, note 11 that Mr. Taal will

7    be able to file a motion to terminate proceedings at his

8    first arrest based on the alleged unlawful arrest -- at his

9    first appearance, I should say.

10           MR. LEE:  So --

11           THE COURT:  Do you disagree with that?

12           MR. LEE:  Well, the way it works practically, your

13   Honor, in immigration court is often, there's long

14   continuances, the courts are so backlogged right now, it

15   often takes other clients months and months to get before a

16   judge where they can actually -- often the first thing they

17   do is you admit or deny the allegations, so even if --

18           THE COURT:  So you don't disagree, you just are

19   emphasizing that will not be as prompt as you believe it

20   should be.

21           MR. LEE:  Because of the First Amendment issues

22   that are at the heart of this case, your Honor.  If it wasn't

23   a First Amendment case, I don't think that our argument on

24   this point would be quite as strong as it is.  But if I

25   could -- could I address a couple of other issues about the

*Taal, et al. v. Trump, et al.- 3/25/25*                    14

1    jurisdictional question related to this?

2              THE COURT:  Yes.

3              MR. LEE:  Okay, because one other element of this

4    which is very important is that even if the court accepts the

5    very -- the coincidental way that the Notice to Appear

6    appears to have been issued -- by the way, we haven't -- we

7    requested that, we have not seen the Notice to Appear, or the

8    date on it, or the charges on it, but the point that we would

9    stress is that the injury that took place here to all three

10   plaintiffs preceded March 14th.  So the Notice to Appear is

11   just an attempt to strip this court of jurisdiction, it

12   doesn't do anything about the injury.  At the very least it

13   doesn't do anything about the standing of the U.S. citizens

14   because --

15             THE COURT:  Mr. Lee, how could the Notice to Appear

16   strip the court or be an effort to strip the court of

17   jurisdiction when the visa was revoked the day before this

18   lawsuit was filed?

19             MR. LEE:  Well, because there is a distinction

20   between the revocation of the visa, which doesn't terminate

21   his status under the INA and, because status is determined at

22   the point of admission to the country, his last admission was

23   in December.  The distinction -- I don't mean to split hairs

24   here, your Honor, the distinction is important because the

25   statute 1252(g) says commencement of proceedings, and in the

*Taal, et al. v. Trump, et al.- 3/25/25*                    15

1    *Reno* -- in *Reno v. AADC*, Justice Scalia was quite clear that

2    things that precede the commencement of proceedings are not

3    barred constitutional challenges.

4         So the point here, you know, again, we have *Ragbir*,

5    we think we're very, very -- we're on very, very solid

6    ground, and I think if you take the evidence that the Second

7    Circuit thought was plausibly pled in that case, and compare,

8    which was that Mr. Ragbir had made certain critical

9    statements of ICE and that ICE had acknowledged that there

10   were -- that they had acted in response to that, the Stanley

11   declaration gets us there, that they just say, attending

12   certain protests, and that's the type of viewpoint-based

13   discrimination which requires the highest level of judicial

14   scrutiny.

15        And again, the way that these orders are being

16   enforced is to say to people out there like Mr. Taal, if you

17   criticize the Trump Administration, if you criticize American

18   culture, which we don't know what that means, if you

19   criticize the U.S. government, those are all the most core

20   protected issues, then you're going to be -- you're going to

21   have to go to jail for a period, civil detention for a period

22   of time which is not a very pleasant place to be, and that's

23   going to --

24        THE COURT:  Mr. Lee, I'd like you to return to the

25   question that I posed about how the timing of the revocation

1    of the visa interplays with the filing of this lawsuit, given

2    your expertise in immigration, you said you're splitting

3    hairs, could you please explain exactly what you're arguing

4    to this court on that issue.

5              MR. LEE:  Sure, and what I mean by that is I think

6    that the government's position is that if the NTA was issued

7    before we filed the lawsuit, that the court doesn't have

8    jurisdiction.  So the -- there is a distinction in status

9    between the visa revocation and the commencement of

10   proceedings, but I think the important thing for this court

11   is, to understand is even if, even if that is a valid NTA and

12   even if the government did in fact prepare it in the hours

13   before this was filed -- and I would say one thing also about

14   the way visa revocations usually work.  I mean the foreign

15   affairs manual, the State Department has to go through a

16   whole number of steps.  Under these declarations, according

17   to the government, what happened was, all on one day, six

18   months later, after this protest, there was a flurry of

19   activity, all the agencies, Executive Branch got together and

20   decided that there was nothing more important to do on a

21   Friday afternoon than revoke Mr. Taal's visa for something

22   that happened a long time ago.

23             THE COURT:  Right, I saw your brief on that, I read

24   that.

25             MR. LEE:  So we have some concerns about that, but

*Taal, et al. v. Trump, et al.- 3/25/25*                    17

1    I think the point on the visa revocation and the timing of

2    the purported NTA has more to do with the fact that, number

3    one, even if the court accepts that as true, it doesn't limit

4    our -- it doesn't damage our position whatsoever because the

5    injury took place before March 14th, the pleadings, the

6    affidavits from our plaintiffs all talk about injuries that

7    were predated.  Mr. Taal's book launch which he couldn't

8    attend was --

9            THE COURT:  Mr. Lee, I'm just going to interrupt

10   you because I'd like to hold off on discussing injuries for a

11   few moments.

12           MR. LEE:  Understood.

13           THE COURT:  Is there anything else you'd like to be

14   heard on right now on the issues that I discussed at the

15   beginning of the hearing?

16           MR. LEE:  Yes, your Honor.

17           THE COURT:  You have another -- you will have more

18   opportunities.

19           MR. LEE:  Understood.  I think the point that I

20   would stress here, your Honor, is that the citizen plaintiffs

21   here, there's nothing in the government's papers which

22   addressed the citizens' injury, which I'm not talking about

23   injury but the court's jurisdiction over the U.S. citizens

24   here.  So I don't think the case can disappear even if they

25   are successful in ordering Mr. Taal's removal and stripping

*Taal, et al. v. Trump, et al.- 3/25/25*                    18

1    this court's jurisdiction of that.

2            If I could just make one factual point and then

3    I'll sit down, is that on page 11 of the government's brief,

4    they say that Mr. Taal "was twice suspended by Cornell for

5    harassment and anti-Semitic conduct."  That's a false

6    statement.  The Exhibits D and E which we submitted at

7    Document 33, he was never suspended for anti-Semitic --

8    anything anti-Semitic, he was never suspended for harassment,

9    he was suspended for participating in a protest.

10           Thank you, your Honor, and I'll look forward to

11   being able to address the court's questions further.

12           THE COURT:  Thank you.  Mr. Kanter, you are

13   appearing for the government?

14           MR. KANTER:  Yes.

15           THE COURT:  I'd like to hear from you on the issues

16   that I discussed at the beginning of the hearing.

17           MR. KANTER:  May it please the court.  This is a

18   challenge to the commencement of removal proceedings, as

19   implicit in and expressed in many of the court's questions.

20   And under provisions of the INA, specifically 8 U.S.C.

21   1252(g), 1252(b)(9), Congress has decided that any claims

22   related to the commencement of the removal proceeding will be

23   channeled through that proceeding, and ultimately be heard

24   there, or on review in the federal courts.

25           With respect to, therefore, if there's any

*Taal, et al. v. Trump, et al.- 3/25/25*                        19

1    meaningful difference jurisdictionally between the visa

2    revocation and the NTA commencement, the visa revocation

3    removed plaintiff Taal's lawful status in the United States.

4    The agency has indicated its intentions to serve Mr. Taal

5    with process, commence the removal proceedings, and the key

6    provisions would be, in terms of the specific language,

7    (b)(9), it's all questions of law and fact, including the

8    interpretation and application of constitutional and

9    statutory provisions arising from any action taken or

10   proceeding brought to commence removal proceedings.  1252(g)

11   uses the terms, any cause or claim by or on behalf of any

12   alien arising from the decision or action to commence.  It's

13   not merely the decision or the action, this is very expansive

14   language.

15           The *Delgado* case that we reference talks about how,

16   the multiplicity of preparatory steps, what's involved in

17   preparing to commence the removal process.  So that's all

18   wrapped up, it's all channeled by Congress and the repeated

19   reference to the *Anti-Discrimination Committee v. Reno* which

20   has very strong precedent upholding 1252(g) and other

21   channeling provisions underscores how Congress sought in its

22   legislation enacting those review bars to really get at two

23   fundamental things.  One, to stop the fragmentation, delay,

24   prolongation of removal proceedings which had presented

25   themselves in a long history of running to a District Court

1   to raise pre-enforcement challenges and the like, and

2   Congress attempted repeatedly to address that issue.  So that

3   history underlying those provisions is very much about the

4   nature of congressional intent as to what types of claims and

5   where they should be developed and heard, and that's in

6   removal proceedings.

7          THE COURT:  Mr. Kanter, what is the government's

8   position on whether Mr. Taal would have an opportunity to

9   file a habeas petition if he is arrested in connection with

10  the impending removal proceeding?

11         MR. KANTER:  Well, a habeas petition is one of the

12  most core rights that any individual has in the Constitution,

13  and counsel's reference to, at the beginning of the argument

14  to the *Ragbir* case goes to the court's question, because

15  *Ragbir* decided at bottom that the channeling provisions that

16  I have been referencing and the court has been asking about,

17  what is their scope, do they include a habeas, for example,

18  that might be challenging something related to the removal

19  process, the right to enter or remain in the United States.

20  And while *Ragbir* was pending, I think on cert., the Supreme

21  Court decided the *Thuraissigiam* case and decided the scope of

22  habeas, the scope of the writ, right, and a very patient and

23  probing examination of that, in which the Supreme Court held

24  that the habeas petition does not encompass claims relating

25  to the right to enter or remain in the United States.

*Taal, et al. v. Trump, et al.- 3/25/25*                    21

1    Therefore, the channeling provisions here include the

2    constitutional and statutory claims that the petitioner is

3    bring -- excuse me, the plaintiff is bringing here.  But to

4    return to your question, anyone in detention would have a --

5    an ability to petition the court in habeas.

6              THE COURT:  Thank you.  Would you like to be heard

7    any further on these specific issues?

8              MR. KANTER:  Not on these specific issues, unless

9    the court has questions.

10             THE COURT:  I have no further questions at this

11   time.  Thank you.

12             MR. KANTER:  Thank you.

13             THE COURT:  Mr. Lee, I'll give you a brief

14   opportunity to respond to the government before I go to the

15   next subject of inquiry.

16             MR. LEE:  Understood, your Honor.  Very briefly

17   then, I'll point the court's attention to page 952 to 53 of

18   the *Reno v. AADC* decision -- oh, I'm sorry, 482, 482, in

19   which Justice Scalia says that 1252(g) applies only to three

20   discrete actions that the Attorney General may take:

21   Commence proceedings, adjudicate cases, or execute removal

22   orders.  There are of course many other decisions or actions

23   that may be part of the deportation process that are not

24   barred by 1252(g).  *Ragbir*, yes, that was about the last of

25   the three --

*Taal, et al. v. Trump, et al.- 3/25/25*                    22

1          THE COURT:  Mr. Lee, just before you move on, was

2     that affected at all by the legislation in 2005 because that

3     was after the case that you just cited, right?

4          MR. LEE:  That is correct, but it's not affected by

5     it because that language remains the same.  The lower courts

6     have all applied the 1252(g) the same way after, to my

7     knowledge I'm not aware of a different treatment.

8          I think the other point I would make on what the --

9     what counsel has said is that it's ironic to hear them

10    claiming the mantle of Congress and the INA for what they've

11    done to Mr. Taal because there's nothing in the INA that says

12    that you can be deported for making loud noises or for

13    attending a protest.

14          THE COURT:  Thank you, Mr. Lee.

15          MR. LEE:  Would the court like me to stay here for

16    the next round or are we switching?

17          THE COURT:  No, you will be next.  I would like to

18    give some preliminary remarks, it's up to you whether you

19    stay at the podium.

20          The court would like to hear from both parties on

21    standing and redressability in light of the fact that

22    Mr. Taal's visa was revoked before this lawsuit began.  For

23    purposes of this argument, right now, the parties should

24    assume that the Immigration and Naturalization Act requires

25    Mr. Taal to raise any challenges to the revocation of his

1    visa and the commencement of removal proceedings during the

2    removal proceedings so we're making that assumption, for

3    purposes of this portion of the hearing.

4         Mr. Lee, I would like you to address specifically

5    what is the injury that Mr. Taal is claiming; how is that

6    injury fairly traceable to the challenged portions of the

7    Executive Orders; how is that injury likely to be redressed

8    by injunctive relief?  In other words, how would injunctive

9    relief address harm that Mr. Taal would suffer during this

10   litigation given that his visa has already been revoked?  And

11   I would like you to address the same questions for the

12   citizen plaintiffs.  You may proceed.

13        MR. LEE:  Thank you, your Honor.  So as we

14   indicated before, the injury to all three of these plaintiffs

15   took place before March 14th.  It continues, but we, under

16   *Roman Catholic Diocese v. New York*, we think that we can get

17   on standing an injury in fact based on that.  If you look at

18   the affidavits which the three plaintiffs have submitted,

19   Mr. Taal has been forced to self-censor speech.  He has said

20   in his affidavit at paragraph 4, that's Exhibit A, "As a

21   result of the EOs, I've been forced to change my prior speech

22   and alter my patterns of interpersonal interaction, refrain

23   from attending protests and political meetings, self-censor

24   what I post on social media and no longer discuss politics

25   with some associates on Cornell's campus."  And I think that

1    the affidavits by the two U.S. citizens also saying, number

2    one, they're concerned about whether they can be criminally

3    prosecuted under that provision of section -- of the policy

4    section of the second Executive Order, but also, I mean

5    Professor Wa Ngugi is Mr. Taal's professor, they have a close

6    academic relationship, we're not in the situation of *Murthy*

7    *v. Missouri* where there's some far-off injury, everybody gets

8    to claim it as the government asserts, this is a concrete,

9    specific, close relationship.  They can't in public attend

10   meetings together, Professor Wa Ngugi says that he's worried

11   about inviting professors over to dinner to talk about

12   Mr. Taal's work.  Mr. Taal's a scholar, that is not

13   acceptable in this country.  Under *Sweezy*, the courts, the

14   Supreme Court has made clear that academic freedom is among

15   the most -- that's where the First Amendment is most

16   important.  So not only do we have viewpoint discrimination,

17   and I'm not -- I'll just come back to the questions about

18   injury, but we have it at the -- at an American university

19   campus which the President says is infested with radicalism.

20        So the traceability, I mean we think government --

21   government gets some points on the jurisdictional issue

22   though we disagree with where they land, but they lose points

23   on, their argument is much weaker now on standing and so we

24   think it's -- the injury has happened, I mean there's

25   nothing, we're not anymore in the territory of *Dryhaus* --

1   *Susan B. Anthony*, we are in actualized past serious

2   irreparable injury.

3           THE COURT:  So if the injury has occurred and it's

4   past, then how would injunctive relief address it going

5   forward while this lawsuit is pending?  We're at the

6   preliminary stages to consider an emergency temporary

7   restraining order motion.

8           MR. LEE:  Because it's ongoing, your Honor, and

9   because it gets worse every minute.  And the fact that

10  Mr. Taal is still afraid, the fact that he's not speaking,

11  the fact that his co-plaintiffs have the right to listen to

12  those views.  That, by the way, just, the right to listen is

13  important because the government can't close the public's

14  access to ideas that it doesn't like, that's from the *Lamont*

15  case.  And so, no, no, this is a situation where the injury

16  is getting worse every day that we don't have injunctive

17  relief, especially considering that we're talking about

18  millions and millions of similarly situated people all across

19  the country.  This is the first challenge --

20          THE COURT:  Mr. Lee, I appreciate that, I'd like

21  you to focus for now on the three plaintiffs that are part of

22  this lawsuit.

23          MR. LEE:  Of course.  Yes, and so in those three

24  cases, those -- that's the injury, and the injury derives

25  itself from the Executive Orders, from January.  So when the

1    government says in the Stanley declaration that it was

2    involvement with protests that aligns with the EO's focus on

3    deporting individuals who perpetuate what they say is

4    unlawful activity, that's the -- that's where the injury

5    comes from.  So it was happening after the Executive Orders,

6    that's what's in the affidavit, the fact that there's an NTA

7    does not cure that, it doesn't make it any better, it's still

8    ongoing.

9          I think the redressability point, your Honor, is

10    important that you ask us to address -- that the court asks

11    us to address.  The defendants say in their brief, neither

12    Executive Order vests any agency with enforcement authority

13    it previously did not have.  But the statements by defendant

14    Trump himself completely explode that argument because the

15    President said that these orders are unprecedented and that

16    there's, you know, that this is a historically new type of

17    approach which the Administration is taking.  There's

18    nothing -- this is, I think, a key point that we really

19    respectfully want to make to this court, is that there is

20    nothing in the Executive Orders that makes someone

21    deportable, whether it's visa revocation for someone who's in

22    the U.S., not talking about what a consulate does abroad,

23    there is nothing in the INA that says that if you attend a

24    protest, that you can be deported, uprooted from your

25    community, or forced to wait in detention for months to

1    litigate that on the constitutional grounds to finally get to

2    an Article III court.  That, in the First Amendment context,

3    cannot go.

4              And so the redressability here is very clearly that

5    we're asking -- we hope we've made it very clear, that is,

6    that what we're asking this court to do is to strike down

7    these orders and enjoin them on the basis of the way in which

8    they clearly go beyond what the INA has limited the grounds

9    of removability to.  If Congress wanted to write attending a

10   protest makes you deportable, they would have done that.

11   They didn't because it's plainly unconstitutional.  I hope

12   there wasn't anything I missed.

13             THE COURT:  Are you aware of any actions that the

14   government has taken based on the policy and purpose language

15   in Executive Order Number 1?

16             MR. LEE:  Well, the President said --

17             THE COURT:  Mr. Lee, I want to focus on any actions

18   that have been taken.

19             MR. LEE:  Well, we think this one is.  So let me

20   try and -- yeah, we think -- let me try and address the

21   relationship between the two Executive Orders.  So there's a

22   lot of crossover language, I think in -- don't want to say it

23   wrong.  In the Stanley declaration or perhaps it's the

24   Armstrong declaration, the defendants' declarant refers to

25   the Executive Orders and the Executive Orders on

1   anti-Semitism, so the government seems to treat these as

2   together.  I think the first Executive Order is the

3   immigration-focused enforcement element, and so when Trump --

4   the reason I started with the quotations from defendant Trump

5   is that when the, when the government refers to pro-jihadi

6   protests, for example, and connects that to what they allege

7   is, falsely alleges is anti-Semitic per se, that is attending

8   a protest against U.S. and Israeli government policy, they're

9   connecting the two themselves.  And there's a lot of

10  crossover in those declarations so, you know, that seems to

11  me to be the plainest way of reading them, together, they

12  were released very closely in time with one another as well.

13          THE COURT:  Okay.  Well, I'll ask the government

14  what they have to say about that.

15          What is the specific relief that the named

16  plaintiffs are seeking?  I also -- if you could answer that

17  question.

18          MR. LEE:  Sure, your Honor.  So we are asking for

19  the court to issue a national injunction on the provisions of

20  the two Executive Orders that go beyond the INA.  So the

21  government makes a lot of noise about saying that this is all

22  about internal reports, et cetera.  This isn't about that,

23  it's about enforcement, it's about going out and taking

24  people out of their homes or asking them to come in and

25  report to ICE for attending a protest.  To the extent that --

1   that's really all that's new which also goes to the issue of

2   redressability.  If the government wanted to enforce the

3   existing civil laws for harassment, for hate speech, there's

4   Title VI, that's all fine.  There wouldn't be a need for

5   these orders if all -- if these orders were only addressed at

6   using the existing authority.  And when defendant Trump

7   himself says that this is unprecedented and that it's based

8   on forceful immediate enforcement action against campuses

9   infested with radicals, that's new.  That's, again, not to be

10  repetitive, that's not in the INA, there is nothing

11  historically that compares with that, we believe, and so we

12  think that the court should issue an injunction against its

13  enforcement nationwide.

14          THE COURT:  Are you asking the court to restrain

15  only the specific portions of the challenged Executive Orders

16  that are quoted in the complaint at paragraphs 39 to 46?

17          MR. LEE:  So in the prayer -- basically yes, your

18  Honor, but in the -- that's really the heart of the orders.

19  I mean, so because there's really nothing else new other than

20  those sections of the order which target speech, and which

21  conflate attending a protest with anti-Semitism.  So this is

22  not speculative, this is not -- we're not just using campaign

23  statements.  The declarations make very, very clear that the

24  government's position officially in this court is that

25  attending a protest makes you subject to the Executive

*Taal, et al. v. Trump, et al.- 3/25/25*                    30

1    Orders.  When they started listening to Mr. Taal's speech,

2    when they started monitoring what he was saying in public

3    meetings and on social media in March, they explicitly say in

4    that Stanley declaration that it's because of these Executive

5    Orders, not because of the statute.  The fact that they come

6    up with some statutory ground much later doesn't, we think,

7    really mean very much.

8              THE COURT:  Okay, thank you, Mr. Lee.

9              MR. LEE:  Thank you, your Honor.

10             THE COURT:  Mr. Kanter, I'd like to hear from you

11   on the government's position on the questions that I

12   addressed initially to Mr. Lee on standing and also on

13   redressability.

14             MR. KANTER:  Thank you, your Honor.  First, the

15   relief that is requested, the injunction is not traceable to

16   the asserted injury of the Executive Orders because under INA

17   Section 237(a)(1)(B), an alien who is unlawfully present in

18   the United States is removable.

19             And as to the United States citizen plaintiffs in

20   this case, your Honor, asserting the right to hear, that

21   cannot be redressed either by enjoining Executive Orders

22   because of the removal authority relating to Mr. Taal's

23   unlawful presence in the United States.  So the plaintiffs

24   here struggle to, and fail to address redressability.

25             There's a related point since these concepts of

1    redressability, traceability, ripeness, standing are related

2    that I would, I would add which is that if the injury is the

3    self-censorship, the fear that I have to not say certain

4    things and so forth, there's no ripeness with regard to that

5    claim because the Executive Orders in question here, they do

6    not prohibit speech.

7            And secondly, there is no standing because those

8    Executive Orders do not instruct that any particular law

9    should be enforced other than existing laws, existing

10   authorities.  So the assertion that the Executive Order

11   directs certain speech be criminalized or that certain speech

12   be hindered or stopped is not reflected on the face of either

13   Executive Order.

14           And finally, I would note that with respect to the

15   court's questions to the government prior to the hearing as

16   to whether both Executive Orders formed a basis for the

17   plaintiff's attempt to enjoin his -- either his detention or

18   the commencement of removal proceedings, the declarations

19   that support our opposition to the TRO reflect that the

20   Executive Order Number 2 relating to combating anti-Semitism

21   is part of the basis for the enforcement actions that have

22   now been commenced with the revocation of the visa and so

23   forth.  But the Executive Order Number 1 did not inform the

24   basis for the State Department's revocation of the visa as

25   reflected in the declaration of John Armstrong which is

*Taal, et al. v. Trump, et al.- 3/25/25*                    32

1    attached to our brief.

2           THE COURT:  Okay, thank you, Mr. Kanter.  I have

3    some questions about ripeness I'd like to ask Mr. Lee first

4    and then I'll give you an opportunity to respond.

5           MR. KANTER:  Thank you.

6           THE COURT:  Mr. Lee, the court has reviewed many

7    cases to prepare for the hearing today, including the Supreme

8    Court's decision in *Trump v. New York* which was issued in

9    2020, that's 592 U.S. 125.  The court is interested in

10   hearing from both parties about whether and how that case

11   applies here.  The court is also interested in hearing from

12   both parties about how specific challenged portions of the

13   Executive Orders are ripe for review.  There are challenged

14   provisions of Executive Order 1 directing departments and

15   agencies to determine information needed to submit reports,

16   to evaluate existing policies, programs, guidance, and to

17   recommend action, and there is also a portion of Executive

18   Order 2 asking for recommendations.

19          Finally, the court is interested in hearing about

20   whether the unlawful limitation in the policy statement in

21   Executive Order 2, where it states unlawful, anti-Semitic

22   harassment and violence, as well as the clauses at the end of

23   both challenged Executive Orders which indicate that they

24   should be implemented consistent with applicable law, whether

25   they affect the ripeness determination or any of the other

*Taal, et al. v. Trump, et al.*- 3/25/25                              33

1      standing questions that we've been discussing.

2               MR. LEE:  Thank you, your Honor.  Just first if the

3      court wants an extensive and helpful answer on Trump against

4      the U.S., I'd be happy to provide that in a letter brief,

5      given the timeline here.

6               THE COURT:  I understand, Mr. Lee.

7               MR. LEE:  I apologize for that, but I will answer

8      that in a letter brief by this evening if the court would

9      like.

10              THE COURT:  I understand.

11              MR. LEE:  Thank you.  On the question of -- because

12     I think the basic issue here on the issue of what these

13     orders do that is new, and whether the government's effort to

14     sort of, we refer to them as magic words in our brief but I

15     don't mean that glibly.  What we're saying is that if, if all

16     the government was doing in this case was relying on the

17     existing authority, then it wouldn't be going out and getting

18     people from their apartments and saying that they're

19     deportable because they attend protests.  I don't mean to

20     sound repetitive like a broken record when we come back to

21     that point, but it's really critical because the government's

22     attempts to present this, these orders as though they're only

23     going to apply it lawfully, just because the President says

24     that they're doing something and they say it's legal, those

25     are theories which are not supported by Separation of Powers

1  Doctrine.

2        They're not supported by the facts of this case

3  either because what the government is doing to Mr. Taal and

4  to many -- and respect the court's position that we're

5  talking about this one particular plaintiff, these three

6  particular plaintiffs, but the reality that's going on

7  outside the courtroom is that there's -- the government is

8  going around and taking people for protesting.  This is

9  exactly what the defendants said they were going to do -- I'm

10  sorry, this is exactly what defendant Trump said he was going

11  to do.

12        Now, back to this issue of redressability and the

13  way that this, what we challenge in these orders.  So yes,

14  the court is correct that what we say, basically what we

15  quote at 39 to 41 is what we're challenging here.  And so the

16  fact -- let me try and put this as succinctly as I can.  The

17  fact that these orders were promulgated and the fact that

18  they are being enforced according to the declarants in the

19  way of, if you attended a protest, you're removable -- and by

20  the way, counsel referred to the Armstrong declaration, it is

21  Armstrong who refers to the anti-Semitism orders, that is at

22  paragraph 5, he refers to the Executive Orders on

23  anti-Semitism, so I think that that undermines the

24  government's effort to separate these two, but what we think

25  is critical -- we do not -- to the extent that these are

1    asking for some internal reports, hey, we think the DOJ

2    should do a better job at using the civil rights authority,

3    that's not -- if that were all that this, these two orders

4    were about, we wouldn't be here.  But they're -- but that's

5    not what they're all about, and the very existence of these

6    orders coupled with the statements by the President and his

7    associates and the enforcement here we think makes that very

8    clear.

9               THE COURT:  But how are those provisions on asking

10    for information and reports and evaluating policies,

11    recommending actions, recommendations, how are those ripe for

12    review?

13               MR. LEE:  Because, because if one reads these three

14    declarations that the government has submitted, that's the

15    mechanism, like that's the government's official position,

16    they view those as the mechanism.  So the reporting --

17               THE COURT:  Mr. Lee, they view those specific

18    provisions in the Executive Orders as --

19               MR. LEE:  I mean, they don't refer your Honor to

20    specific sections in the declarations, but if one takes the

21    Stanley declaration at page -- at paragraph 5, it says, to

22    implement this Executive Order, HSI proactively reviews open

23    source information to identify individuals subject to the

24    Executive Order.  Now we may learn in discovery the exact

25    sections that that's -- maybe there were reporting mechanisms

1    internally, maybe there were efforts to -- you know, it's

2    hard for me here to specifically pinpoint because we haven't

3    seen those documents yet, we hope to be able to.  But what we

4    do know is that the, that the defendants are monitoring

5    speech of people who are here lawfully who are engaged in

6    protest activity and speech that are -- that the

7    government -- with which the defendants disagree, and that

8    the -- to the extent that those mechanisms are being applied

9    in a way that is restrictive of speech, that's

10   unconstitutional.

11           Now one, one additional point I would make quickly,

12   your Honor, is again, we are not in -- we are not challenging

13   these orders to the extent that they apply to individuals

14   seeking admission to this country for the first time.  That

15   case may come up, there may be litigation on that, but that's

16   a very different situation under *Muñoz*, under *Mandel*, under

17   *Mezei*.  We're challenging this, these orders to the extent

18   that they apply to individuals who are, as the President

19   said, resident aliens who attend a protest in the United

20   States.  And on the question of -- not to bounce back and

21   forth too much, but defendant Trump said he's going to deport

22   all of them if they attended a protest by the end of the

23   year, that's in eight months.  I don't think it gets any

24   riper than that.

25           So that is, those are reasons -- and last point on,

*Taal, et al. v. Trump, et al.- 3/25/25*                    37

1    to the extent that your Honor's question relate to the

2    authority for a nationwide injunction on this basis, we think

3    that the Second Circuit's decision in DHS -- in *New York v.*

4    *Department of Homeland Security* is very clear on two points

5    that are critical.  Number one, that the court, the Second

6    Circuit said there clearly still is national injunction

7    authority, and number two, the times when that national

8    injunction authority are limited are when there's a lot of

9    other litigation challenging the same orders, when there's a

10   chance for mixup and contradictory decisions from the

11   district courts, sort of a percolation argument, we don't

12   have that here because this is the only case challenging

13   those Executive Orders.

14         THE COURT:  Mr. Lee, does Executive Order 1 create

15   any mechanism for the government to take enforcement action?

16         MR. LEE:  We think, yes, because --

17         THE COURT:  Can you tell me -- can you please tell

18   me where in Executive Order 1 there is that language?

19         MR. LEE:  Yes.  Well, I think, number one, it comes

20   from the fact that there is a -- an internal effort to find

21   all the authority that they've -- the government could

22   possibly find by 30 days after the order was issued.  So just

23   because we can't point to the specific, you know, internal

24   memos yet about exactly how the government's going to be

25   carrying out, clearly there was a requirement, section 3

*Taal, et al. v. Trump, et al.- 3/25/25*                    38

1    refers to it as an immediate, as soon as possible, no later
2    than 30 days, Secretary of State, Attorney General, DHS, DNI
3    should basically evaluate everything in the INA.
4              THE COURT:  Mr. Lee, you didn't challenge that
5    provision, did you?
6              MR. LEE:  Well, this is -- well, this is -- yes, we
7    do, to the extent that these are being challenge -- to the
8    extent that this is being used to chill speech, we read these
9    two Executive Orders together in that way.
10             THE COURT:  I understood that you were not
11   challenging the entirety of the Executive Order.  I asked you
12   earlier if you were challenging the specific provisions in
13   the complaint.
14             MR. LEE:  Correct, and so we are, I think your
15   Honor's point is that we certainly challenge aspects of, and
16   I hope we made this clear in the prayer at the end of the
17   complaint, that we are challenging all aspects of these
18   orders that are used by the government to, to chill speech
19   and to target individuals who are here lawfully.
20             THE COURT:  Okay, thank you, Mr. Lee.
21             MR. LEE:  Thank you, your Honor.
22             THE COURT:  Mr. Kanter, would you like to be heard
23   on the issue of ripeness?
24             MR. KANTER:  Briefly, your Honor.
25             THE COURT:  And you may of course respond to other

*Taal, et al. v. Trump, et al.- 3/25/25*                    39

1   statements that Mr. Lee has made or arguments that you'd like

2   to.

3         MR. KANTER:  Thank you.  Your Honor mentioned *Trump*

4   *v. New York*, which is cited in our opposition brief at page

5   10, for the proposition that any prediction how the Executive

6   Branch might eventually implement a general statement of

7   policy is no more than conjecture at this time, and the case

8   underscores the aspect of ripeness, that there needs to be

9   something concrete.  Plaintiffs come to this court to invoke

10  its extraordinary powers, to change the status quo, not just

11  preserve, to change the status quo, to enjoin Executive

12  Orders which are unquestionably lawful in innumerable ways.

13  They need to show something tangible, direct, concrete, and

14  they have not done that.  That's why ripeness is lacking.

15        THE COURT:  Mr. Kanter, do you think that Unit

16  Chief Stanley's statement that the HSI Office of

17  Intelligence, and I quote, "proactively reviews open source

18  information to identify individuals subject to," Executive

19  Order 2, that's the end of the quote before we get to

20  Executive Order 2 because that's our shorthand, not the way

21  it is in the real world, does that affect the ripeness

22  analysis at all?

23        MR. KANTER:  That's an interesting question, your

24  Honor.  The process described by HSI Agent Roy Stanley is one

25  of an investigator.  Someone who, after the new

*Taal, et al. v. Trump, et al.- 3/25/25*                    40

1    administration comes in, sets new policies, new policy

2    emphases and priorities is then, as he describes, going about

3    his work in determining what tools and existing authorities

4    are at our disposal to address the core purpose of the

5    President's Executive Order, Executive Order Number 2, noting

6    the surge in anti-Semitism, harassment, and violence across

7    the country in the wake of the October 7 attacks and the need

8    to review, assess, report, recommend what can be done, what

9    additionally can be done to address that problem.  It's

10   largely a direction to the agencies, we call it an

11   internal-facing document.  It's rallying the Executive Branch

12   to say, hey, there's a problem, let's solve it.

13           I think Roy Stanley, Agent Roy Stanley's process,

14   which is described here, was one of an investigator who

15   perhaps casts the net broadly and then follows the facts and

16   where they lead.  And to that, to that point, and the nature

17   of the conduct that Mr. Stanley, Agent Stanley reviewed, I

18   would just note his declaration at paragraph 8 noting that

19   based on open source records, the Cornell University campus

20   police determined Mr. Taal had engaged in disruptive conduct

21   that violated the university's code in multiple ways; for

22   instance, knowingly following individuals who had used force,

23   pushing aside Cornell University police officers to gain

24   access to an off-campus university event at the Ithaca

25   Statler Hotel on September 18, 2024, and failing to follow

1    directives and campus police orders.  Noise from the

2    resulting protest was so loud that bystanders reported

3    medical complaints and possible hearing loss.  Mr. Stanley,

4    Agent Stanley conducted his review according to the policy

5    priorities that were set by the Administration and his

6    superiors undoubtedly at ICE and that's the context in which

7    the enforcement referral was generated to the Department of

8    State.

9              THE COURT:  And so is it your position that it does

10   or does not affect the ripeness analysis?

11             MR. KANTER:  It ... it affects the ripeness

12   analysis in this respect, which is, there is no injury that

13   is cognizable in invoking the court's injunctive powers.

14   There's a very high standard that has to be met.  If that's

15   the issue, the question is, are the -- is the injury, the

16   self-censorship ripe, what Agent Stanley did led to the

17   revocation of a visa and the unlawful presence of Mr. Taal,

18   there's a process for that.  Ripeness as to the Executive

19   Orders has not been established, that Mr. Stanley -- I keep

20   saying Mr., I mean Agent Stanley --

21             THE COURT:  Unit chief is apparently his title in

22   his affidavit.

23             MR. KANTER:  Thank you, thank you, your Honor.

24   Unit Chief Stanley did was to do what was envisioned in the

25   Executive Order, preparatory assessments, review, report,

1    recommend, that is in fact what is described in his

2    declaration.  It's what's called for in the Executive Order.

3    He did that, but the Executive Order did not tell him to

4    prosecute speech or remove a, an outspoken critic of Israel

5    on a particular university campus.

6                THE COURT:  Thank you, Mr. Kanter.  Mr. Lee, did

7    you want to reply?

8                MR. LEE:  Yes, your Honor.  Very briefly.  The

9    parade of horribles about what Mr. Taal was disciplined for,

10   that's attending a protest.  Sometimes they're noisy,

11   sometimes there's a little disruption, there's nothing in the

12   INA that says that you can be deported for that basis.  The

13   government's acknowledging that these -- that the questions

14   that the court was just posing were in response to the

15   Executive Orders and not the INA.  Thank you.

16               MR. KANTER:  Your Honor, I do have one

17   clarification if I might.

18               THE COURT:  Yes, Mr. Kanter.

19               MR. KANTER:  The only clarification with respect to

20   my earlier comments is that Agent -- Inspector Stanley is the

21   declarant and the declaration does not in fact say who the

22   investigator was, the Stanley declaration is describing the

23   investigation process.

24               THE COURT:  Thank you.

25               MR. KANTER:  Thank you.

1          THE COURT:  Mr. Lee, do you have anything further

2     that you would like to address to the court?

3          MR. LEE:  Briefly, if I may, your Honor.

4          THE COURT:  Yes.

5          MR. LEE:  We would point the court's attention to

6     the historically unprecedented character of the actions of

7     the Executive Branch in this moment in American history

8     vis-a-vis these three plaintiffs.  There is no more core

9     First Amendment right than access to the courts and access --

10    and the right to criticize the United States government and

11    its policies, both for a noncitizen who's already here and

12    for citizens who have a right to listen.  What the Executive

13    Branch is trying to do here is to close off access to the

14    public to ideas with which it doesn't like.

15         This court has jurisdiction, either under *Ragbir*,

16    either because there is not an alternative unlawful visa

17    overstay or criminal conviction that is the additional

18    reason, this is not a selective enforcement challenge, this

19    is about the only basis that the government has for this

20    removal, as they acknowledge in the declarations in the

21    brief, is that Mr. Taal attended a protest for five minutes,

22    six months ago.  He cannot be required, for his sake and for

23    the sake of millions of -- tens of millions of people in this

24    country, to have to sit in jail, possibly miles away from his

25    home, in order to finally, months from now, adjudicate those

*Taal, et al. v. Trump, et al.- 3/25/25*                    44

1    constitutional claims because that's -- the chill is the

2    injury here.  Thank you very much, your Honor.

3          THE COURT:  Thank you, Mr. Lee.  Mr. Kanter, is

4    there anything further?

5          MR. KANTER:  Your Honor, I have nothing further

6    unless the court has additional questions.

7          THE COURT:  Thank you.  Thank you both for your

8    arguments today.  Thank you again, I know you all worked very

9    hard on this case over the weekend and I very much appreciate

10   that.  I'll take the motion under advisement.

11         COURTROOM DEPUTY:  Court is adjourned.

12              (Court Adjourned, 3:01 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4           I, JODI L. HIBBARD, RMR, CRR, CSR, Federal

5    Official Realtime Court Reporter, in and for the

6    United States District Court for the Northern

7    District of New York, DO HEREBY CERTIFY that

8    pursuant to Section 753, Title 28, United States

9    Code, that the foregoing is a true and correct

10   transcript of the stenographically reported

11   proceedings held in the above-entitled matter and

12   that the transcript page format is in conformance

13   with the regulations of the Judicial Conference of

14   the United States.

15

16                     Dated this 17th day of April, 2025.

17

18

19                     /S/ JODI L. HIBBARD
                       _____

20                     JODI L. HIBBARD, RMR, CRR, CSR
                       Official U.S. Court Reporter
21

22

23

24

25